UNITED STATES of America, Appellee,

v.

**Ralph BORELLO, Appellant.**

**No. 954, Docket 84-1367.**

United States Court of Appeals,
Second Circuit.

Argued March 28, 1985.

Decided June 12, 1985.

---

Herald Price Fahringer, New York City (Diarmuid White, New York City, on the brief), for appellant.

William C. Bryson, Dept. of Justice, Washington, D.C. (Raymond J. Dearie, U.S. Atty. for the E.D.N.Y., Brooklyn, N.Y., Laura A. Ward, Alan M. Friedman, Dept.

of Justice, Washington, D.C., of counsel), for appellee.

Before FEINBERG, Chief Judge, and OAKES and WINTER, Circuit Judges.

OAKES, Circuit Judge:

Ralph Borello appeals from his conviction of attempting to introduce "adult" films into the United States by means of false statements, in violation of 18 U.S.C. § 542 (1982),[1] and smuggling the films into the United States, in violation of 18 U.S.C. § 545,[2] after a jury trial in the United States District Court for the Eastern District of New York, Henry Bramwell, *Judge.* Both counts involved the same material, namely five cartons of films containing some 771 so-called hard-core pornographic films. The conviction resulted in a $5,000 fine and concurrent maximum prison terms under the two statutes, two years for violating section 542 and five years for violating section 545. Borello makes a multifaceted attack on the judgment, challenging various aspects of the indictment, the evidence, the jury charge, and the sentence.

Several of his claims are meritless, but at least one—the improper admission of a government witness's cooperation agreement—requires that we reverse and remand for a new trial.

## BACKGROUND

The Government's evidence showed that on three occasions between November 1980 and June 1981 Ralph Borello arranged for the importation of films into this country. On all three occasions, Borello relied on the services of Vincent Montello, a licensed customs broker, who subsequently became a principal Government witness testifying under an immunity agreement. In November 1980, Borello used the pseudonym "Ralph Parker," purporting to represent "Abe's Electronics," evidently a non-existent company having Borello's own home address and telephone number. Borello learned from Montello that films could be admitted without screening by the Customs Service if the importer signed a "request for waiver of screening" representing that the films contained no depictions of human

1. Section 542 reads in pertinent part:

Entry of goods by means of false statements

Whoever enters or introduces, or attempts to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance, or makes any false statement in any declaration without reasonable cause to believe the truth of such statement, or procures the making of any such false statement as to any matter material thereto without reasonable cause to believe the truth of such statement, whether or not the United States shall or may be deprived of any lawful duties; or

Whoever is guilty of any willful act or omission whereby the United States shall or may be deprived of any lawful duties accruing upon merchandise embraced or referred to in such invoice, declaration, affidavit, letter, paper, or statement, or affected by such act or omission—

Shall be fined for each offense not more than $5,000 or imprisoned not more than two years, or both.

2. Section 545 reads in pertinent part:

Smuggling goods into the United States

Whoever knowingly and willfully, with intent to defraud the United States, smuggles, or clandestinely introduces into the United States any merchandise which should have been invoiced, or makes out or passes, or attempts to pass, through the customhouse any false, forged, or fraudulent invoice, or other document or paper; or

Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law—

Shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Proof of defendant's possession of such goods, unless explained to the satisfaction of the jury, shall be deemed evidence sufficient to authorize conviction for violation of this section.

Merchandise introduced into the United States in violation of this section, or the value thereof, to be recovered from any person described in the first or second paragraph of this section, shall be forfeited to the United States.

sexual organs or conduct.[3] In addition, the request for waiver of screening requires that the films be identified by title or category. Borello signed several importation forms, including a request for waiver of screening, identifying the films as "Adventure Films (Westerns, Sci-Fi, Suspense)." The films were not screened and were delivered to Borello's home address by Montello's regular trucker. Borello received a set of the Customs documents from Montello and paid the duty on the films in cash. Borello was not charged with any offense in connection with this importation, evidence of which went only to his knowledge and intent.

Four months later, Montello received a telephone call requesting that he prepare documentation for the importation of another shipment of films to be delivered to "Ralph" at Borello's home address for "Kalins Cinema, Ltd.," another fictitious company with the same address and telephone number as Borello. After "Ralph" advised Montello that there was no explicit sexual conduct in the films, Montello filed a request for waiver of screening, identifying the films as "Science fiction, Westerns, Drama, adventure." The Custom officials approved the films' release, and the films were delivered to Borello's home address. Borello personally took delivery of and signed a receipt for the films. He was not charged in connection with this shipment, either.

The charges brought against Borello arose out of a June 1981 importation. Montello received a telephone call requesting that he broker the importation of a film shipment, this time on behalf of "Triad Communications," again a fictitious company with Borello's home telephone number. As with the March shipment, Montello filled out the documents, including a request for waiver of screening. The completed package of documents that he submitted to the Customs Service listed Triad Communications as the consignee; the shipment invoice was addressed to "Ralph"; the shipping documents identified "Ralph" as the Triad representative. On this occasion, however, the Customs inspectors were not satisfied with the request for waiver of screening, which failed to identify the films in any way. In response to a query from Customs about the titles of the films, Montello called Borello's home number and spoke to a man named "Ralph" who gave him a list of titles: "Saturday Night Fever," "Star Wars," "Grand Prix," "Barracuda," and "Quo Vadis." Montello then prepared and submitted to Customs another document containing this list.

After receiving the document, one of the Customs inspectors conducted a spot check. The first film taken from one of the cartons was "True Grit," which was not on the list. He dug deeper into the carton and withdraw a black and white cardboard box with a pastoral scene on it. Upon opening, the box proved to cover a smaller box that bore pornographic pictures and contained a sexually explicit film as well as a brochure advertising several other pornographic films. The shipment was then seized. It

---

**3.** The request for waiver of screening in this case reads as follows:

We respectfully request that the film entitled _____ imported by _____ on _____ which is described on the invoice accompanying the film or the entry therefore [sic], be released without being previewed by U S Customs to determine whether its importation is prohibited by 19 U S C 1305. In Support of this request, I declare that the film contains no scene depicting or portraying any of the following:

(1) Exposure of any Human sexual organ, buttocks, or unclothed female breast.

(2) Sexual intercourse or physical contact with a persons [sic] unclothed or clothed genitals, pubic areas, buttocks, or a female breast.
(3) Any act of deviant sexual conduct.

We further declare that the film does not contain language which is commonly regarded in the united [sic] States as obscene and does not contain language specifically descriptive of the things, conduct, or activities covered by (1), (2), or (3) above.

We also declare that we have either seen this film projected or have satisfied ourselves through appropriate inquiry that the penalties provided by 18 U S C and 1001 and by 19 U S C 1592 are applicable with respect to false declarations.

appears that nonpornographic films were packed on the top and bottom levels of each large carton, while the rest of the carton contained pornographic films. In all, the five cartons contained 810 films, 771 of which are sexually explicit.

Borello's mother and another witness testified for the defense that Borello worked as a mechanic or manager of mechanics, servicing video or "peep show" machines at Show World in the Times Square area of New York City. Government testimony had established that Show World offers live sex shows, adult films, and coin-operated peep show machines in which 8mm films such as those found in the cartons can be observed by customers. After the Government threatened to offer to show the films to the jurors, defense counsel signed a stipulation to the effect that the request for waiver of screening was inaccurate.[4] A thirty-five page inventory of the film titles contained in the shipment was attached to the stipulation. A number of those titles were sufficiently explicit to be unpleasant,[5] to say the least. The prosecution over objection was permitted to pass to the jury the inventory and one of the pastoral boxes masking another box that in turn contained an adult film called "Der Spanner"—translated as "The Voyeur"—and a twenty-six page brochure depicting still scenes from a series of sexually explicit films. At the judge's suggestion, the jurors were told they could "open it up if you want." The judge apparently studied the jurors' reaction, because he reported at sentencing that only one woman juror, but all of the men jurors, had opened the carton and looked at the brochure and film.

### DISCUSSION

A. *The Relationship Between Sections 542 and 545*

Count I, charging a violation of section 542, closely resembles Count II, charging a violation of section 545. Indeed, the only difference between the counts is that Count I states that Borello

> did enter and introduce and attempt to enter and introduce into the commerce of the United States imported merchandise, that is, five cartons of motion pictures, by means of false statements and by means of false and fraudulent invoices, declarations and other false and fraudulent papers,

While Count II states that Borello,

> with intent to defraud the United States, caused a false and fraudulent invoice and other false and fraudulent documents and papers ... to be made out, and caused his agent, Vincent Montello, to pass and attempt to pass said documents through the custom house at John F. Kennedy Airport in order to secure the importation of five cartons of motion pictures into the United States and their entry in the commerce of the United States.

---

4. The stipulation reads in pertinent part:
 IT IS HEREBY STIPULATED AND AGREED ... that the attached is a true and accurate list of the film titles of the films contained in the five cartons, imported by Triad Communications, New York, New York from L. Hagen Import A.S., Norway in June 1981, and that 771 of the 810 films contained in the five cartons contain scenes "depicting or portraying the following:
 (1) Exposure of any Human sexual organs, buttocks, or unclothed female breast.
 (2) Sexual intercourse or physical contact with a persons [*sic*] unclothed or clothed genitals, pubic area, buttocks, or a female breast.
 (3) Any act of deviant sexual conduct."

5. A random selection, to make the point in text, includes:

| | | Sexually Explicit | |
| --- | --- | --- | --- |
| Film # | Title | YES | NO |
| 53 | Fucking Lolita | X | |
| 54 | Summer Orgy | X | |
| 55 | Lesbian Sisters | X | |
| 56 | Graduation Day | X | |
| 57 | Supe Tit Fuck | X | |
| 58 | Sexy Beginners | X | |
| 59 | Mama's Girl Friend | X | |
| 60 | Party Pissing w/Lit | X | |
| 61 | Sweet Cunt w/Lit | X | |
| 62 | Anal School Girl | X | |

Borello argues that the indictment is defective on three alternate grounds, all of which he raised in pretrial motions. First, he argues that the conduct alleged in the indictment does not constitute a violation of section 545. His second argument is that he cannot be punished for violating both sections 542 and 545 because both involve the same offense. Third, he urges that section 542 must at least have been charged as a lesser included offense under section 545, again barring punishment under both statutes and possibly conviction of both crimes.

Borello's contention that section 545 is inapplicable in this case has two prongs. On the one hand, he claims that section 545 was aimed only at schemes designed to evade the payment of import duties or to import goods clandestinely. Borello bases this conclusion on an interpretation of the legislative history of section 545. According to Borello, section 545 should be given

the same meaning as earlier versions of the statute, section 593 of the Tariff Act of 1930,[6] and section 19 of the Tariff Act of 1842,[7] both of which required a showing that the defendant had the "intent to defraud the revenue of the United States." Congress deleted the specific reference to revenue when enacting section 545, *see supra* note 2, but Borello argues that Congress was only correcting "bad grammar" and that we should read the reference to revenue back into section 545. This court specifically held, however, in *United States v. McKee*, 220 F.2d 266, 269 (2d Cir.1955), that the deletion of the reference to revenue made it "no longer necessary to show that the item or items introduced clandestinely into the United States were subject to duty."[8]

■ Nevertheless, Borello claims that *McKee* is consistent with his interpretation

---

**6.** Section 593 provided:

SMUGGLING AND CLANDESTINE IMPORTATIONS.

(a) Fraud on Revenue.—If any person knowingly and willfully, with intent to defraud the revenue of the United States, smuggles, or clandestinely introduces into the United States any merchandise which should have been invoiced, or makes out or passes, or attempts to pass, through the custom-house any false, forged, or fraudulent invoice, or other document or paper, every such person, his, her, or their aiders and abettors, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in any sum not exceeding $5,000, or imprisoned for any term of time not exceeding two years, or both, at the discretion of the court.

(b) Importation Contrary to Law.—If any person fraudulently or knowingly imports or brings into the United States, or assists in so doing, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law, such merchandise shall be forfeited and the offender shall be fined in any sum not exceeding $5,000 nor less than $50, or be imprisoned for any time not exceeding two years, or both.

(c) Presumptions.—Whenever, on trial for a violation of this section, the defendant is shown to have or to have had possession of

such goods, such possession shall be deemed evidence sufficient to authorize conviction, unless the defendant shall explain the possession to the satisfaction of the jury.

Tariff Act of 1930, ch. 497, § 593, 46 Stat. 590, 751.

**7.** Section 19 stated:

*And be it further enacted,* That if any person shall knowingly and wilfully, with intent to defraud the revenue of the United States, smuggle or clandestinely introduce into the United States any goods, wares, or merchandise, subject to duty by law, and which should have been invoiced, without paying or accounting for the duty, or shall make out, or pass, or attempt to pass, through the custom-house, any false, forged, or fraudulent invoice, every such person, his, her, or their aiders and abettors, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in any sum not exceeding five thousand dollars, or imprisoned for any term of time not exceeding two years, or both, at the discretion of the court.

Tariff Act of 1842, ch. 270, § 19, 5 Stat. 548, 565.

**8.** The Supreme Court and this court had held that the earlier language required proof of intent to evade customs duties. *See Keck v. United States*, 172 U.S. 434, 444–45, 19 S.Ct. 254, 257–58, 43 L.Ed. 505 (1899); *United States v. Kushner*, 135 F.2d 668, 670 (2d Cir.), *cert. denied*, 320 U.S. 212, 63 S.Ct. 1449, 87 L.Ed. 1850 (1943).

of section 545.[9] He distinguishes *McKee*, as a case involving surreptitious entry, noting that this case involves only the submission of false documents.[10] That is to say, the Government need not show evasion of import duties in a case involving clandestine entry of goods, but must show evasion of import duties in a case such as this one involving an attempt to pass fraudulent papers through the customhouse. We must agree with the Government, however, that *McKee* supports the indictment. Section 545 prohibits two types of conduct: smuggling or clandestinely introducing goods and passing false papers through the customhouse. *See supra* note 2. The "intent to defraud the United States" requirement must apply to both types of conduct in the same way. After *McKee* the evasion-of-duties showing is inapplicable to both clandestine entry and passing false papers.

◼ On the other hand, Borello argues that section 545 does not prohibit the conduct alleged in the indictment because section 542 prohibits the same conduct, citing *Busic v. United States,* 446 U.S. 398, 407–08, 100 S.Ct. 1747, 1753–54, 64 L.Ed.2d 381 (1980). Again, Borello relies on the pedigree of section 545. He notes that section 545 and section 542 were enacted as part of the same legislation in 1948—section 542 based on section 591 of the Tariff Act of 1930[11] and section 545 on section 593 of the same statute. He relies on the fact that section 593 was aimed at schemes to evade payment of import duties while section 591 was aimed at schemes to import goods by means of false statements. Borello further notes that in enacting sections 545 and 542 Congress failed to state that both provisions apply to the same conduct. He concludes that "[i]n the absence of such specific authorization, it must be concluded that Congress did not intend that section 545 apply to the mere entry of goods by means of false statements." We disagree. *Busic* and the earlier case it relies on for finding that Congress did not intend one statute *to cover* the same conduct prohibited by another, *Simpson v. United States,* 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978), both turned on explicit evidence in the legislative history of the statutes involved that Congress did not intend the apparently redundant coverage. As Borello notes, the legislative history of sections 545 and 542 fails to mention redundant coverage. Only explicit evidence in the legislative history can overcome the presumption that the Government can charge[12] someone with violating two statutes that plainly prohibit the same conduct.

Borello argues that, even if sections 545 and 542 both prohibit the same conduct, he cannot be punished under both statutes because the two provisions charge the

---

**9.** Borello also suggests that *McKee's* analysis is "misguided." A panel of this court, however, is in no position to overrule 30-year-old precedent. Moreover, other courts have agreed with the *McKee* court's conclusion that § 545 covers fraudulent schemes for purposes other than evading the payment of duties. *See United States v. Kurfess,* 426 F.2d 1017, 1019 (7th Cir.), *cert. denied,* 400 U.S. 830, 91 S.Ct. 60, 27 L.Ed.2d 60 (1970); *United States v. Boggus,* 411 F.2d 110, 113 (9th Cir.), *cert. denied,* 396 U.S. 919, 90 S.Ct. 245, 24 L.Ed.2d 198 (1969).

**10.** Borello notes that the Government expressly disavowed any theory of clandestine entry of goods. At the charging conference the prosecutor stated, "If you notice also we don't use the word 'clandestinely,' we say smuggling can be accomplished by the making of a false statement and forms submitted." Borello concedes,

as he must, that someone could validly be convicted of both clandestinely bringing goods into the country under § 545 and violating § 542. *See United States v. Piascik,* 559 F.2d 545, 551 (9th Cir.1977), *cert. denied,* 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978).

**11.** For our purposes, § 591 prohibited the same conduct as § 542 now prohibits.

**12.** We pause to note the distinction between whether the Government can charge violations of two similar statutes and whether the court can punish someone for violating the same two statutes. Only *Busic* and *Simpson* address the former. We address the latter *infra* notes 13–18 and accompanying text.

same offense.[13] *Compare Whalen v. United States*, 445 U.S. 684, 691–92, 100 S.Ct. 1432, 1437–38, 63 L.Ed.2d 715 (1980), *with Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932) ("[t]he applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not"). *See also Albernaz v. United States*, 450 U.S. 333, 337–39, 101 S.Ct. 1137, 1141–42, 67 L.Ed.2d 275 (1981); *United States v. Woodward*, —— U.S. ——, 105 S.Ct. 611, 612–13, 83 L.Ed.2d 518 (1985) (per curiam); *Ball v. United States*, —— U.S. ——, 105 S.Ct. 1668, 1672, 84 L.Ed.2d 740 (1985) ("proof of illegal receipt of a firearm [by a felon] *necessarily* includes proof of illegal possession of that weapon" by a felon) (emphasis in original).[14]

We are called upon to decide whether section 542 requires proof of a fact that section 545 does not—that is, whether proof of a section 545 violation necessarily includes proof of a violation of section 542.[15] The Government argues that there are two ways that one could violate the prohibition against passing false documents through the customhouse without violating section 542.[16] First, the Government argues that section 545 requires a showing of intent to defraud while section 542 does not. That may be so, but any violation of section 545 based on false documentation would obviously constitute a violation of section 542. Second, the Government claims that one can violate section 545 without attempting to import goods, while section 542 requires a showing of actual or attempted importation. This may be true in respect to receipt, concealment, purchase, sale or facilitation of transportation, concealment or sale, but in the factual context of passing false papers through the customhouse the importation of goods would necessarily be involved. The Supreme Court has suggested that section 545 covers only cases involving the unlawful importation of goods. *See One Lot Emerald Cut Stones v. United States*, 409 U.S. 232, 234, 93 S.Ct. 489, 491, 34 L.Ed.2d

---

**13.** Borello also argues that Counts I and II are multiplicitous, citing *United States v. Israelski*, 597 F.2d 22, 24 (2d Cir.1979). Multiplicity, however, becomes an issue typically only if someone is charged with more than one violation of the same statutory provision. *See, e.g., Bell v. United States*, 349 U.S. 81, 83–84, 75 S.Ct. 620, 622–23, 99 L.Ed. 905 (1955) (reversing conviction of two violations of the Mann Act based on transportation of two women across state lines in same trip in same vehicle); *United States v. Lartey*, 716 F.2d 955, 967–68 (2d Cir. 1983) (affirming conviction on multiple counts of violating narcotics distribution statute based on several different transactions); *Israelski*, 597 F.2d at 24–25 (describing other cases). Borello, of course, was charged with violating two different statutes. The relevant question is whether Congress intended to punish someone under both statutes for the same conduct.

**14.** In *Missouri v. Hunter*, 459 U.S. 359, 368, 103 S.Ct. 673, 679, 74 L.Ed.2d 535 (1983), the Court used the *Blockburger* test to determine whether punishing someone under two different statutes for the same conduct violated the double jeopardy clause of the Fifth Amendment. The Court found that the Missouri legislature had made its intention to punish under both statutes crystal clear. *Id.*

**15.** We agree with the Government that proof of a § 542 violation does not necessarily include proof of a § 545 violation. Section 542 prohibits any false statement, written or oral, while § 545 prohibits only written false statements. *But cf. infra* note 16.

**16.** We pause to note that § 545's prohibition of actual smuggling or the clandestine entry of goods is irrelevant to our analysis. Although the Government does not offer the argument, one might claim that a § 545 violation for clandestine entry of goods does not necessarily entail a violation of § 542 and thus that the two statutes do not constitute the same offense under *Blockburger*. The Supreme Court apparently has never defined what a court should analyze as the relevant offense under *Blockburger* for a statute that contains multiple prohibitions. In *Ball*, however, the Court ignored the fact that the two firearms statutes involved covered different classes of persons, though both, of course, covered felons. *See* 105 S.Ct. at 1674.

438 (1972). In this case, the indictment explicitly links the section 545 violation to importation. Because we reverse and remand for a new trial on other grounds, we can and do decline to resolve this problem of statutory interpretation on the record and arguments before us. But on remand, this issue may well have to be addressed by the district court.

In a similar vein, Borello urges us to hold that section 542 is a lesser included offense of section 545. While two courts have held that an intent to defraud must be shown under section 542, *see United States v. Ven-Fuel, Inc.,* 602 F.2d 747, 753 (5th Cir. 1979), *cert. denied,* 447 U.S. 905, 100 S.Ct. 2987, 64 L.Ed.2d 854 (1980); *United States v. Dixon,* 7 F.Supp. 918, 919–20 (S.D.N.Y. 1934),[17] the Government has failed to brief the issue, and again we see no reason to resolve it at this point.[18]

## B. *The Jury Charge*

The district court agreed with defense counsel's request, concurred in by the Government, that the prosecution had to prove with respect to both counts that Borello knew that the documents containing

false statements were to be communicated to a government official. Borello argues now that the judge omitted this instruction in violation of Fed.R.Crim.P. 30[19] and that the instruction was "crucial" because Montello, not Borello, signed and submitted the request for waiver of screening and the list of nonpornographic films describing the shipment intended for Triad Communications. Borello notes that no list of titles was required as part of the November and March shipments, and thus contends there was no way that he knew or could have known that the list of films he gave over the phone on the occasion of the third, or June, shipment would be submitted to Customs.

The court instructed the jury, in connection with Count II, that the Government had to prove that Borello attempted to pass documents through the customhouse and that he acted knowingly and willfully and "with the intent to defraud the United States." The jury in other words had to find that by causing false documents to be passed through the customhouse Borello specifically intended to deceive or cheat the United States. Concededly, however, the court's charge to the

---

In the light of *Ball,* we analyze only the § 545 "offense" of passing false documents.

**17.** The Government chose to prosecute the § 542 violation as requiring a showing of intent to defraud the Government. *See infra* text accompanying note 19. While we have failed to find any case discussing the issue, we see no reason why the Government cannot choose to seek convictions for violating two statutes—thus avoiding a lesser included offense instruction— where one of the statutes makes optional proof of the element on which the lesser included offense issue turns. In other words, if § 542 prohibits both intentional falsehoods and reckless ones but § 545 prohibits only intentional falsehoods, the Government can presumably bypass the lesser included offense problem, by arguing that the defendant can be found guilty of violating § 542 only if the jury finds that he had an intent to defraud.

**18.** In *United States v. Osorio Estrada,* 751 F.2d 128, 134–35 (2d Cir.1984), *modified,* 757 F.2d 27 (2d Cir.1985), this court addressed how an appeals court should deal with multiple convictions in the lesser included offense context.

The court sought to reconcile two lines of cases: those vacating the conviction of the lesser included offense, and those simply vacating the sentence on but not the conviction of the lesser included offense. The Supreme Court, however, decided *Ball* after our decision in *Osorio Estrada.* Although the *Ball* Court does not use the term, the case appears to fall within a lesser-included context. The Court stated that the charges on both counts could go to the jury but that the judge "should enter judgment on only one of the statutory offenses." 105 S.Ct. at 1674. Moreover, the Court remanded "with instructions to have the District Court exercise its discretion to vacate one of the convictions." *Id. Ball* thus appears to be inconsistent with *Osorio Estrada.* Nevertheless, we wait for another day to decide whether *Ball* overrules *Osorio Estrada,* noting that the *Ball* Court did not address the issue explored in *Osorio Estrada,* namely the subsequent vacation on collateral attack of the count on which judgment had been imposed.

**19.** Borello relies solely on the requirements of Rule 30. He does not argue—and we do not hold—that § 542 requires proof of an intent to defraud the Government.

jury in connection with Count I was not as explicit. The court instructed the jury that to convict on that count it had to find that Borello willfully and knowingly attempted to introduce the five cartons of motion pictures into the United States "by means of false and fraudulent ... papers, to wit, a Customs consumption entry package of forms and a request for waiver of viewing." The court explained that the falsehoods had to be causally related to the actual importation of the films and defined a "fraudulent" representation as one "made with the intent to deceive the government agency to whom submitted." In defining a "false statement" the court advised the jury that "a false statement to an agency of the United States government is not an offense unless the statement made is a material statement." Thus, under those instructions it would have been next to impossible for the jury to convict Borello on Count I without finding that he knew a government agency would be the ultimate recipient of the false and fraudulent documents. In sum, we find that the instructions given were for all practical purposes equivalent to those requested.

■ The fact that the court did not use the precise language requested does not render the instruction erroneous or prejudicial. *See Sugarman v. United States,* 249 U.S. 182, 185, 39 S.Ct. 191, 192, 63 L.Ed. 550 (1919). As we noted in *United States v. Taylor,* 562 F.2d 1345, 1364 (2d Cir.), *cert. denied,* 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977), "if the substance of a defendant's request is given by the court its own language, the defendant has no cause to complain." By the same token, we must reject Borello's claim that the court's failure to charge precisely as requested prejudiced him. *See United States v. Lyles,* 593 F.2d 182, 186 (2d Cir.), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979). Nothing in the Government's rebuttal argument or the court's charge undercut Borello's closing argument that the Government had to prove that Borello knew the documents would be submitted to some part of the Government.

We fail to see how the court's instructions impaired "the effectiveness of counsel's argument and hence of appellant's defense." *Wright v. United States,* 339 F.2d 578, 580 (9th Cir.1964).

C. *Sufficiency of the Evidence*

■ We must also disagree with Borello's contention that the evidence was insufficient to support his conviction. Borello suggests that no evidence connected Borello to the false documents for the June shipment. According to Montello's testimony the phone call for the June shipment came from an unidentified source at Triad Communications. Montello, not Borello, signed all the forms personally, including the request for waiver of screening. There was no testimony that Montello explained to Borello the purpose of the list of film titles or the use to which he would put it.

We find that Borello has not sustained the heavy burden required for overturning a conviction based on insufficiency of the evidence. This court recently restated the standard as follows:

Viewing the evidence in the light most favorable to the government and construing all permissible inferences in its favor, the court must ask "whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt."

*United States v. Figueroa,* 750 F.2d 232, 237 (2d Cir.1984) (quoting *United States v. Carson,* 702 F.2d 351, 361 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2457, 77 L.Ed.2d 1335 (1983)). The flaw in Borello's argument is that he assumes that the entire case turns on the list of films. It does not. The jury could reasonably have concluded that Borello orchestrated the importation and in particular that Borello placed the phone call setting the June shipment in motion. The similarity between the June shipment and the previous shipments that Borello clearly engineered strongly supports the inference that Borello was the person directing the June importation. Here again, the importer was a fictitious

company at Borello's home address and telephone number. "Ralph" was the name of the company representative and the person with whom Montello spoke to get the false list of titles that he subsequently submitted to the Customs official. To be sure, Montello's testimony was that the original Triad caller did not indicate that he had ever done business with Montello before, but this does not mean that the caller was not Borello. Montello testified on cross that he had used the film invoice to fill out the request for a waiver of screening but he prepared the request for waiver at the direction of the Triad representative who had told him there was no obscene material in the films and the jury could reasonably have inferred that the representative was Borello. Moreover, in connection with the prior shipments, Montello had explained the waiver of screening procedure to Borello, at which time Borello had assured him that the films were not sexually explicit. Thus, the jury could have inferred that Borello knew that the list of films was needed to facilitate the release of the films without screening. In short, assessing all the evidence, the jury could reasonably have concluded that Borello willfully made false statements to the customs officials.

### D. The Admission of Montello's Cooperation Agreement

■ At the outset of Montello's testimony, the prosecutor offered to read into the record the terms of Montello's agreement with the Government. Borello's counsel, who had not attacked Montello's credibility in his opening statement or otherwise, objected. The court admitted the evidence. The prosecutor noted that Montello agreed to testify in exchange for the Government's agreement not to prosecute him for his participation in the activities about which he testified. In addition, the prosecutor read that portion of the agreement

stating that Montello would "make immediate, full and truthful disclosure of all the information in his possession to the Government," would "waive his Fifth Amendment privilege against self-incrimination" and would "provide full, complete and truthful testimony before the Grand Jury and as a Government witness at any trial or hearing." The agreement also provided that, if Montello failed to cooperate, the Government would be free to prosecute him for his participation in making false statements as well as "for perjury should it ever be discovered that Vincent Montello has provided false testimony in connection with this matter."

Admitting the entire agreement in evidence on direct examination, before a challenge to Montello's credibility, was directly contrary to the case law in this circuit. *See United States v. Maniego*, 710 F.2d 24, 27 (2d Cir.1983); *United States v. Arroyo-Angulo*, 580 F.2d 1137, 1146 (2d Cir.), *cert. denied*, 439 U.S. 913, 99 S.Ct. 285, 58 L.Ed.2d 260 (1978).[20] Noting that it is clearly proper to introduce the agreement on redirect, after the witness's credibility has been attacked, the *Arroyo-Angulo* court stated that permitting the Government to introduce the agreement on direct "runs afoul of the well established rules of evidence that absent an attack on the veracity of a witness, no evidence to bolster his credibility is admissible." *Id.* While we recognized in *Arroyo-Angulo* that the existence of a cooperation agreement was "a double-edged sword," *id.*, in *United States v. Barnes*, 604 F.2d 121, 151 (2d Cir.1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980), we reaffirmed our conclusion that:

> although the use of a cooperation agreement cuts both ways insofar as it suggests not only a promise to testify truthfully, but also to testify as the Govern-

---

**20.** We recognize that other courts of appeals apparently disagree. *See, e.g., United States v. Oxman,* 740 F.2d 1298, 1302–03 (3d Cir.1984), *petition for cert. filed,* 53 U.S.L.W. 3530 (U.S. Dec. 27, 1984) (No. 84–1033); *United States v.* *McNeill,* 728 F.2d 5, 14 (1st Cir.1984); *United States v. Henderson,* 717 F.2d 135, 137–38 (4th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1006, 79 L.Ed.2d 238 (1984).

ment wished (regardless of where the truth may lie), the agreement, when introduced by the Government, is used primarily to bolster the credibility of a witness.

The dual import of the agreement led us, however, to create an exception to the rule. In *United States v. Singh,* 628 F.2d 758, 761 (2d Cir.), *cert. denied,* 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496 (1980), we held that the Government may bring out on direct examination "the circumstances surrounding a witness's motivation for cooperating with the Government or other matters damaging to the witness's credibility." The exception serves to avoid an inference by the jury that the Government is attempting to keep from the jury the witness's possible bias. *Id.*

 The Government seeks to bring this case within the exception and not the rule, arguing that Montello was "a most reluctant witness whose grudging testimony was in many respects more helpful to the defense than to the prosecution," and that the purpose of the offer was "to impeach Montello, rather than to bolster his testimony." We cannot agree. As Judge Mulligan wrote for the court in *United States v. Edwards,* 631 F.2d 1049, 1052 (2d Cir.1980) (citation omitted):

> The rule of *Arroyo-Angulo* and the doctrine enunciated in *Singh* indicate that the Government may not introduce the entire cooperation agreement on direct examination of its witness since the witness' credibility has not been attacked and the *entire* cooperation agreement bolsters more than it impeaches.... However, the elicitation of the fact of the agreement and the witness' understanding of it, as a motivation for the witness to testify for the Government, should be permitted on direct examination in order to anticipate cross-examination by the defendant which might give the jury the unjustified impression that the Government was concealing this relevant fact.

What is important, as *Edwards* recognized and the prosecution and district court should have recognized in this case, is that the prosecutor should not offer the written cooperation agreement into evidence on direct even though he can both inquire as to the fact that a cooperation agreement has been signed and permit the witness to identify the agreement and to explain his understanding of the terms of it. This procedure, as *Edwards* says, avoids having "the jury ... learn at that time that the agreement was revocable if the witness perjured himself, that upon such perjury the witness might be subject to prosecution for any and all crimes, and anything the witness had previously said could be held against him." *Id.* Thus the witness's direct testimony merely concerns his or her motive for cooperating with the Government. The testimony thus does not constitute bolstering. In this case, the bolstering portions of the written agreement were admitted over objection and were before the jury on direct. The rule of *Arroyo-Angulo* was violated.

The Government argues, of course, that the error was harmless, claiming that Borello never attacked Montello's credibility. Our review of the record indicates that Borello attempted to use some of Montello's testimony in his own defense, but challenged other parts of Montello's story. In any event, we have previously suggested that an *Arroyo-Angulo* error is harmless if the defendant subsequently attacks the witness's credibility. *Barnes,* 604 F.2d at 151. The error, however, cannot always be harmless. As Judge Jerome Frank stated for the court, lo, these many years ago, referring in dissent to an opinion approving as harmless error a prosecutor's improper appeal to jury prejudice in wartime:

> If we continue to do nothing practical to prevent such conduct, we should cease to disapprove it. For otherwise, it will be as if we declared in effect, "Government attorneys, without fear of reversal, may say just about what they please in ad-

dressing juries, for our rules on the subject are pretend-rules. If prosecutors win verdicts as a result of 'disapproved' remarks, we will not deprive them of their victories; we will merely go through the form of expressing displeasure. The deprecatory words we use in our opinions on such occasions are purely ceremonial."

*United States v. Antonelli Fireworks Co.,* 155 F.2d 631, 661 (2d Cir.) (Frank J., dissenting), *cert. denied,* 329 U.S. 742, 67 S.Ct. 49, 91 L.Ed. 701 (1946). So too here, where we have spelled out in a series of cases the procedure for introducing cooperation agreements. For us to disapprove of the present procedure permitting the bolstering of the witness's testimony and then to declare it harmless error would make our remarks in the previous cases purely "ceremonial." The error cannot be deemed harmless.

### E. *The First and Fifth Amendments*

█ Noting that the Government is not "free to adopt whatever procedures it pleases for dealing with obscenity," *Marcus v. Search Warrant,* 367 U.S. 717, 731, 81 S.Ct. 1708, 1716, 6 L.Ed.2d 1127 (1961), Borello urges that he was denied the protections of the First Amendment free speech clause and the Fifth Amendment due process clause. The argument hinges on the claim that—while nominally prosecuted for submitting false documents to customs—he was in fact charged, tried and sentenced for importing adult films without any determination that the materials were legally obscene. He is correct, of course, that these materials were not legally obscene. Nevertheless, Borello's fraudulent conduct violated valid customs law prohibitions. In *United States v. Orito,* 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973), the Supreme Court held that the United States could prohibit the importation of "any obscene ... motion-picture film." 18 U.S.C. § 1462(a). By extension, the cus-

toms laws validly prohibit the importation into the United States from any foreign country of "any obscene ... print, picture, drawing, or other representation, figure, or image on or of paper or other material." 19 U.S.C. § 1305(a) (1982). Surely, Customs officials can permissibly screen materials entering the country to enforce these laws.[21] *See United States v. Ramsey,* 431 U.S. 606, 616–19, 97 S.Ct. 1972, 1978–80, 52 L.Ed.2d 617 (1977); *United States v. 12 200-Ft. Reels of Super 8MM. Film,* 413 U.S. 123, 125–26, 93 S.Ct. 2665, 2667–68, 37 L.Ed.2d 500 (1973). By the same token, Customs can predicate a waiver of screening on a statement by the importer describing the material being imported and warranting that the materials are not sexually explicit. And, of course, the Government can punish someone who intentionally makes false statements about such matters.

In this case, a routine and permissible inspection revealed that an overwhelming percentage of Triad's films depicted pornographic scenes and contained sexually explicit material in all respects contrary to the statements made on valid customs forms. It was perfectly proper for the prosecution to elect not to charge Borello with violations of the laws governing the importation and distribution of obscene materials but rather to charge him with customs fraud. *See United States v. Batchelder,* 442 U.S. 114, 123–24, 99 S.Ct. 2198, 2203–04, 60 L.Ed.2d 755 (1979); *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978); *Commercial Credit Corp. v. United States,* 58 F.2d 195, 196 (2d Cir.1932).

█ Borello also complains that the films were improperly seized and detained by the Customs Service. The claim, however, is based on improper forfeiture and improper seizure of materials pursuant to an obscenity prosecution. Neither is involved here. As noted above, the opening

---

**21.** Even if Customs cannot prohibit the importation of nonobscene films, it can ask importers if they are importing sexually explicit but nonob-

scene films, in order to make its own initial determination whether the films should be allowed into the country.

of the cartons and the screening of the films were plainly permissible steps in a reasonable border search. Once the search was made the Customs Service had probable cause to believe that the films constituted evidence of customs violations, making the seizure of the films lawful. *See United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 1660–61, 80 L.Ed.2d 85 (1984); *Texas v. Brown*, 460 U.S. 730, 738–39 & n. 4, 103 S.Ct. 1535, 1540–41 & n. 4, 75 L.Ed.2d 502 (1983) (plurality opinion); *id.* at 748, 103 S.Ct. at 1546 (Stevens, J., concurring in the judgment). Since no one sought to claim the films after the shipment was detained, it was reasonable for the Government to retain the films pending presentation of the case to the grand jury and the subsequent trial.

### F. *Sexually Explicit Evidence*

Borello also claims that the district court erred in permitting the Government to introduce pornographic materials into evidence. He argues that he was unfairly prejudiced in violation of Fed.R.Evid. 403 by the introduction of the list of films in the cartons and the brochure that accompanied one of the films.

Borello's counsel expressed a concern about the sexually explicit nature of these materials early in the proceedings. During the voir dire counsel asked the court, "Would you be willing because of the obscenity aspect of the case, would you be willing to ask the jurors if any of them belong to any religious organizations [*sic*] that has as one of its purposes, the dealing of [*sic*] literature that deals with sex?" The prosecutor interjected, "Your Honor, I have difficulty with that because this is really not an obscenity case per se." The court replied, "It isn't—I will deny you that. She's right. It's not an obscenity case per se but the subject matter, they are aware of. From your question itself they

are aware of the subject matter but she's right, this isn't an obscenity case per se." Had it in fact been an obscenity case, doubtless Borello's counsel would have been entitled to inquire whether prospective jurors were members of organizations, religious or otherwise, that were opposed on a moral basis or otherwise to pornographic films. Nevertheless, the jury was shown and urged to examine the list of film titles, the carton containing a pornographic film, and the twenty-six page full-color brochure graphically depicting still scenes from sexually explicit films made by a producer calling himself "The King of Porno." As noted above, the judge stated at sentencing that the jurors' reaction upon examining the brochure was one of revulsion: "it was so filthy they didn't even want to look at it." In addition, the prosecutor made the point during her summation that the content of the films was dangerous, asking the rhetorical question, "what if they had gotten through?"

■■■■ We believe that the district court failed to make the careful assessment whether the probative value of the list and brochure were substantially outweighed by the prejudice that would flow from admitting them.[22] The Government argues that the list was relevant, because it showed "how grossly inaccurate was the list Montello obtained from Borello." According to the Government, the stipulation indicated only that the request for waiver of screening was inaccurate; proof of a gross inaccuracy was necessary to foreclose any suggestion of inadvertence or mistake. The titles themselves, however, did not add anything to the Government's case on this point; the jury already had testimony that 771 of the 810 films in the shipment were sexually explicit. Moreover, Borello never raised a defense of mistake or inadvertence. Absent such a defense, the list and

---

22. The district court, of course, has wide discretion in making the assessment under rule 403. *See United States v. Aulet*, 618 F.2d 182, 191 (2d Cir.1980); *United States v. Medico*, 557 F.2d 309, 317 (2d Cir.), *cert. denied*, 434 U.S. 986, 98 S.Ct. 614, 54 L.Ed.2d 480 (1977). Nevertheless, the court's remarks in this case also suggest that it may have failed to exercise that discretion properly.

brochures have no probative value. By analogy, we have forbidden the introduction of prejudicial similar crimes evidence as part of the Government's main case to rebut a potential claim of mistake or inadvertence. *See United States v. Figueroa,* 618 F.2d 934, 939–42 (2d Cir.1980).

Similarly, the Government claims that the titles and the brochure revealed the clearly sexual nature of the films, leaving no doubt that Borello was aware of the nature of the films and thus that his representations were intentionally false. This argument also seems overstated. The invoices from the Norwegian exporter referred to "Ralph" by name and referred to the films as the ones he ordered. The jury knew that the films were pornographic and that Borello knew that the films were pornographic.

Finally, the Government contends that the list of titles and the brochure revealed that the films would be used in a peepshow operation and thus that Borello had a strong incentive to defraud Customs. Other evidence was admitted, however, showing that Borello worked at a Times Square peep show operation. The jury was well aware of the general nature of the movies and could easily infer that the films were for use in Borello's business.

In sum, whatever probative value the exhibits had was minimal, in sharp contrast to the obvious prejudicial effect they very probably had on the jurors. The Government cannot claim during voir dire that this case is not an obscenity case and then succeed at trial in making the pornographic nature of the materials a major issue. The Government could have brought an obscenity count but did not, apparently for tactical reasons. We hold it to that choice. The brochure and the list should stay out of the case on remand, absent a defense of mistake or inadvertence.[23]

Reversed and remanded.

---

**23.** Borello also raises several challenges to the actions of the judge in sentencing. Because we are reversing the conviction and remanding for another trial, we need not address Borello's claims in detail. At the same time, if Borello is convicted again the same issues may present themselves to the sentencing judge. We would feel remiss if we did not provide some guidance for this contingency.

Borello argues that the judge should not have found that Borello was associated with organized crime when the importations took place. The challenge turns on an interpretation of our decision in *United States v. Fatico,* 579 F.2d 707, 713 (2d Cir.1978) (*Fatico I*). In this case, the court held a *Fatico* hearing, which is used to determine whether under due process the sentencing judge can properly rely on statements made by the Government—typically in the presentence report—to the effect that the defendant is a member or associate of organized crime. In *Fatico I,* the court held that "Due Process does not prevent use in sentencing of out-of-court declarations by an unidentified informant where there is good cause for the nondisclosure of his identity and there is sufficient corroboration by other means." *Id.* (footnote omitted). This court has declined, however, to specify a rigid burden-of-proof standard. *See United States v. Fatico,* 603 F.2d 1053, 1057 n. 9 (2d Cir.1979), *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980) (*Fatico II*). The sole witness at the hearing was a New York City police officer who had been investigating organized crime for fifteen years. Much of his testimony involved hearsay statements by an unnamed informant linking Borello to Robert DiBernardo, a "soldier" in the Gambino crime "family." Borello argues that the only evidence supporting the organized crime finding by the court were uncorroborated statements from this informant in violation of *Fatico I,* 579 F.2d at 713. The detective's own testimony did corroborate parts of the informant's story, but perhaps the most damaging statements by the informant went uncorroborated in any way. The Government would be wise to have stronger evidence if it later seeks to affiliate Borello with DiBernardo.

Borello also claims that the judge relied on an inappropriate determination that society is victimized by pornographic films. Borello relies on our decision in *United States v. Brown,* 479 F.2d 1170 (2d Cir.1973), where we stated that it would be improper under the First Amendment for the sentencing judge to "base the sentence on his revulsion arising out of [defendant's] social [Black Panther] ... views." Borello's argument is not frivolous. The Government would have us equate the pornographic business with obscene materials—a dubious equation in New York City. The Government's argument that the court could consider unprosecuted unlawful conduct thus ignores the critical problems with the judge's remarks. A federal court certainly can agree with Congress that the presentation of obscene materials causes social harm, without jumping to the conclusion that all sexually explicit material is necessarily corrupting—material which, although controversial and unpalatable to many, may well be protected in certain respects by the First Amendment.