UNITED STATES of America, Appellee,

v.

Jeffrey HARVEY, Defendant–Appellant.

No. 39, Docket 92–1110.

United States Court of Appeals,
Second Circuit.

Argued Oct. 22, 1992.

Decided April 15, 1993.

James R. McGraw, Syracuse, NY, for defendant-appellant.

Elizabeth S. Riker, Asst. U.S. Atty., Syracuse, NY (Gary L. Sharpe, U.S. Atty., N.D.N.Y., of counsel), for appellee.

Before: OAKES, NEWMAN, and PIERCE, Circuit Judges.

PIERCE, Circuit Judge:

This case concerns the government's efforts to enforce a statute that addresses the problem of child pornography. This appeal arises from defendant-appellant's conviction for the knowing receipt of a videotape, which had been transported in interstate commerce, and that depicted minor children engaging in sexually explicit conduct. We must determine whether, on the facts herein, reasonable cause was required under the Constitution prior to the government's targeting of a suspect for criminal investigation, and whether government agents overstepped the line between setting a trap for the "unwary innocent" and the "unwary criminal," *Sherman v. United States*, 356 U.S. 369, 372, 78 S.Ct. 819, 821, 2 L.Ed.2d 848 (1958), in attempting to enforce 18 U.S.C. § 2252(a)(2).[1] We also must determine whether the materials and testimony offered by the government and received in evidence so prejudiced the jury as to deny the defendant a fair trial.

The defendant appeals from a judgment, entered in the United States District Court for the Northern District of New York (Neal P. McCurn, *Chief Judge*), convicting him of violating 18 U.S.C. § 2252(a)(2), a statute that prohibits, *inter alia*, the know-ing receipt of visual depictions of a minor engaging in sexually explicit conduct.[2] For the reasons set forth below, we reverse and remand for a new trial.

## BACKGROUND

On August 28, 1991, in the United States District Court for the Northern District of New York, appellant was charged in a one-count indictment with having "knowingly receive[d] a visual depiction that had been transported and shipped in interstate and foreign commerce and mailed and ... [having] knowingly received in the mail one videotape containing three films, the production of which involved the use of minor children engaging in sexually explicit conduct and which depicted said minor children engaging in this same sexually explicit conduct" in violation of 18 U.S.C. § 2252(a)(2). As used in 18 U.S.C. § 2252, " 'minor' means any person under the age of eighteen years." 18 U.S.C. § 2256(1).

On November 25, 1991, appellant proceeded to trial before Judge McCurn and a jury in which the following evidence was adduced. In the course of investigating violations of the laws prohibiting child pornography, agents of the United States Customs Service investigated the National Motion Picture Corporation ("NMPC"), located in Miami, Florida. NMPC was in the business of selling erotic videotapes through the United States mails. With NMPC's assistance, Customs Service agents obtained NMPC's current mailing list, which contained the names of 5,700 persons, who

---

1. Section 2252 of Title 18 was originally enacted in 1978 as part of the Protection of Children Against Sexual Exploitation Act of 1977, Pub.L. No. 95–225, § 2(a), 92 Stat. 7, 7–8 (1978), *as amended by,* Child Protection Act of 1984, Pub.L. No. 98–292, § 4, 98 Stat. 204, 204 (1984), *as amended by,* Child Abuse Victims' Rights Act of 1986, Pub.L. No. 99–500, § 704(b), 100 Stat. 1783–74, 1783–75, Pub.L. No. 99–591, § 704(b), 100 Stat. 3341–74, 3341–75 (1986), *as amended by,* Child Protection and Obscenity Enforcement Act of 1988, Pub.L. No. 100–690, § 7511(b), 102 Stat. 4485, 4485 (1988), *as amended by,* Child Protection Restoration and Penalties Enhancement Act of 1990, Pub.L. No. 101–647, § 323(a), 104 Stat. 4816, 4818 (1990).

2. In pertinent part, § 2252(a)(2) prohibits any person from

    ....

knowingly receiv[ing] ... any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, ... if—

  (A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

  (B) such visual depiction is of such conduct;

    ....

had at one time or another purchased one or more items from NMPC. The name and address of Jeffrey Harvey, the appellant, were found on the mailing list. The operators of NMPC informed the Customs Service agents that approximately forty to fifty customers from their mailing list had written, specifically requesting child pornography material. According to NMPC's officers, these letters had been destroyed. The Customs Service agents, in their investigation of NMPC, found no child pornography material in its possession, and the Customs Service had no evidence that Harvey had requested child pornography material from NMPC.

One David Rich, a Customs Service agent who was involved in the investigation leading to the filing of the charges against Harvey, testified that some of the films listed on fliers NMPC sent to its customers contained films from the company's "Girlie Watcher Series." According to Agent Rich, generally "[t]hese films depict[ed] older teen-age girls, girls over the age of 18 dressed up to look younger than they really are. By dressed up[, I] mean maybe with pony-tails, bobby socks, just their appearance, they're trying to make the girls look younger than they actually are.... The girls have sex with other people in the films." During the trial, these films were referred to as simulated child pornography.

In early October 1989, an introductory letter, which Agent Rich prepared, was mailed along with one or two fliers from NMPC to everyone on NMPC's current mailing list. The introductory letter stated:

Dear Customer:

As we have stated in the past there have been certain types of materials that have not been a part of our inventory. Due to certain bans and stateside attitudes we felt it was not in our best interest to stock these items. Because of increased requests and inquiries, we have contracted a company in Belgium[,] **"ARTISTE INTERNATIONALE"**, who [sic] specializes in the extremely hard to obtain erotica. Their guarantee is "If we don't have it, you can't get it".

The letter also stated, "If interested in these types of materials, write directly to them" at a post office box in "Bruxelles, Belgium." Agent Rich further testified that Belgium was a source country for child pornography, and that the post office box in Belgium "was put in there so if that [sic] these individuals are knowledgeable [about] where child pornography comes from, if they were so inclined to be interested in purchasing these types of materials, by putting Belgium in there they may consider this is a place [where] I can buy child pornography." The United States Customs Service, with the cooperation of the Belgium Customs Service, opened and maintained the post office box in Belgium listed in the introductory letter. Correspondence received in that post office box was removed by a United States Customs Service agent, initialed and dated, and then placed unopened in a mailing pouch and sent by registered mail to Agent Rich in the United States.

In a letter postmarked October 14, 1989, addressed to the subject post office box in Belgium, Harvey requested that "a catalog or other literature" be shipped to "Literal Tech"—his place of employment—at a post office box in Syracuse, New York. On November 27, 1989, Harvey sent another letter requesting "a catalog of materials as described in the attached memorandum." Attached to the letter was a photocopy of the introductory letter mailed to Harvey in October 1989. These letters were forwarded by the agent in Belgium to Agent Rich in the United States.

If a person sent a request to the Belgian post office box and sought a general catalog, a "specific interest" response letter was mailed to the correspondent. A representative "specific interest" letter that was prepared in connection with the investigation read:

Dear Friend:

In your latest correspondence you requested materials concerning our products. As we previously related, our current inventory is voluminous. Due to the number of items in our inventory and the radical differences in these items we

have found that it is not cost productive to maintain one general catalog of our inventory.

Therefore, if you could specify the areas in which you are interested we can better service your needs by returning to you the appropriate advertisements.

Please forgive this delay, but past experiences have shown this to be the most effective way to satisfy all of our customers.

Sincerely
Artiste Internationale

Such a "specific interest" letter was mailed to Harvey. Agent Rich testified:

Mr. Harvey along with ... many other individuals wrote into the post office box in Belgium and simply requested a catalogue of the product. Now, rather than send these people a catalogue which we already had prepared containing advertisements of child pornography, there still is no indication that Mr. Harvey ... or any of these other individuals might have simply been interested in child pornography....

... From the outset of the operation, then we're asking these people could you please tell us the areas that you're interested in, that [was] the purpose of this letter being mailed to an individual who asked for a general catalogue.

A later letter dated December 12, 1989, which Harvey sent to the post office box in Belgium, stated in part:

Gentlemen:

As per the attached memorandum from you: Please send me a catalog of adult video and/or literature featuring younger performers.

Included with the December 12, 1989 letter was a copy of the "specific interest" letter the government had composed. In another letter dated January 24, 1990, and sent to the post office box in Belgium, Harvey requested "a catalog of adult video featuring young performers." In another letter dated March 6, 1990, and sent to the post office box in Belgium, Harvey wrote:

Gentlemen:

With reference to the attached memorandum from you: I have on SEVERAL OCCASIONS requested an X-rated video catalog featuring your youngest performers. If this is insufficient information, you'll have to send me a list of catalogs you have from which I can choose. This is my FOURTH COMMUNICATION! Please respond.

In the letters dated November 27, 1989, December 12, 1989, January 24, 1990 and March 6, 1990, Harvey provided a return post office box address in Syracuse, New York and each of these letters contained Literal Tech's street address in Syracuse, New York for delivery of the requested materials. In response to these letters received from Harvey, the government prepared, and sent to Harvey an order form and a catalog advertising videotapes, magazines and sets of photographs, between March 6 and April 3, 1990. The catalog advertised that in each videotape, at least one child, between the ages of five and fifteen years, was engaged in explicit sexual activity. In an envelope postmarked April 3, 1990, the government received a completed order form for four videotapes, each of which depicted a young girl engaging in explicit sexual activity with at least one man, and a money order for the videotapes from one "Brent Purtzer," who gave as a return address the Syracuse post office box Harvey previously had included in his letter dated March 6, 1990. Over defense counsel's objection, Agent Rich was permitted to read the titles of the advertised videotapes and the order form's explicit descriptions of the videotapes.

Four letters and envelopes, addressed to the post office box in Belgium, were also received in evidence: these items were postmarked June 8, 1990, July 7, 1990, August 1, 1990 and September 13, 1990. In these letters, Purtzer complained about not having received the order he had placed in April 1990. In two of the letters, Purtzer indicated that the company may have had him listed as "Jeff Harvey." In the letter dated September 13, 1990, and mailed to the post office box in Belgium, Purtzer complained about the delay in receiving his April 1990 order and wrote: "Will you PLEASE get the order shipped or refund

my money with an explanation AS SOON AS POSSIBLE? I could become a good customer of yours—if you actually have product to ship!"

A videotape—approximately thirty minutes in length—was prepared in Florida by United States Customs Service agents from films seized from another individual in a different investigation; the videotape contained three of the four films that had been ordered by Brent Purtzer. This videotape ("subject videotape") was mailed to a Customs Service officer in Buffalo, New York "for delivery to the individual and to the address in all of the correspondence."

One Paul Bouffard, a special agent with the United States Customs Service, assigned to the Buffalo, New York area, testified regarding delivery of the subject videotape to Harvey on January 16, 1991. Agent Bouffard, who was dressed as an employee of a private air courier, made the delivery to Literal Tech's street address by entering Suite 305, at the address listed on the correspondence received in the post office box in Belgium. When Agent Bouffard announced that "I have a package for Jeff Harvey," Harvey identified himself as that person. Agent Bouffard testified that he placed the package down on Harvey's desk so that Harvey could see the return address, namely, "BP 35, Bruxelles, 23, Bruxelles, Belgium," and to whom it was to be delivered, namely, "Literal Tech/Jeff Harvey, personal and confidential, Suite 305, 201 South Main Street, North Syracuse, New York, attention Jeff Harvey." After Harvey looked at the package, Agent Bouffard told Harvey he had to sign for it; Harvey then signed a receipt and handed it to him.

Agent Bouffard acknowledged, on cross-examination, that the governmental investigators had a suspicion that Harvey had closed his box at the post office in Syracuse, in December 1990, because he did not want the package to be delivered. However, several of the letters mailed to the post office box in Belgium contained Literal Tech's street address "for anything that must be shipped to a physical address, not using the post office" in the event Artiste

Internationale shipped the requested material via a private courier. Approximately five minutes after Agent Bouffard made the delivery, Harvey left the building with a package, entered his car, and drove to his residence. Nearly twenty to thirty minutes later, he left his residence and returned to the building where Literal Tech was located. Later that day, investigators went to Harvey's office and explained to him that they had search warrants for both his business and his residence to search for the package that had been delivered that morning. Harvey stated that the material was at his residence, whereupon United States Postal Inspector Thomas Walmsley and Harvey proceeded to the latter's residence. Thereafter, investigators executed the search warrant for Harvey's residence, where they found the subject videotape delivered by Agent Bouffard, as well as more than 150 pornographic videotapes, films and magazines.

Inspector Walmsley testified in detail concerning videotapes and order forms found in Harvey's house during the search. As to one group of materials, according to Inspector Walmsley, seven videotapes and an eight-millimeter film contained visual depictions of females over the age of eighteen engaging in sexually explicit conduct. The women, Inspector Walmsley testified, were made to look under the age of eighteen. Walmsley was allowed to read the titles of the seven videotapes and the eight-millimeter film to the jury. Thereafter, this material was referred to as simulated child pornography. In addition, Walmsley testified that one tape in Harvey's house was an untitled film purportedly of a professional adult male actor engaging in sexual contact with a sixteen-year-old girl; another videotape, from NMPC, found in Harvey's house showed a nudist beach and focused on the breast and genital areas of underage girls, although that tape did not depict sexually explicit conduct.

In another group of materials, Inspector Walmsley read to the jury the titles of four other videotapes that Harvey had ordered previously from NMPC, including "Swallow It All," which Walmsley stated depicted "sexual activity including the activity of

eating human excrement and that type of material." He also was permitted to read to the jury the explicit titles of other adult videotapes that Harvey possessed that he had ordered from two other mail-order companies. Defendant's attorney objected to the admission of all of this evidence, arguing that the material was being offered "simply to prejudice the jury" and that the proffered material was not relevant. The court overruled the objections, and the order forms and the videotapes involving activities of persons both over as well as under eighteen years of age were received into evidence by the court, all "as some evidence to be considered by the jury in connection with the issue of predisposition which I will advise later on."

On cross-examination by defense counsel, Inspector Walmsley responded affirmatively when asked whether he had run into situations "in regard to these kinds of investigations ... where individuals possess all different types of X–rated material, S[adism] and M[asochism], oral, anal, that sort of thing...." On re-direct by the government, Walmsley testified that a "person who has a wide variance of sexual interests would be called a sexually indiscriminate person." In further questioning, Walmsley was asked by the prosecutor if he had found any films depicting bestiality, sadomasochism and sexual activity involving human waste in Harvey's home, to which Walmsley responded in the affirmative.

It was stipulated to the jury that the subject videotape Harvey received at Literal Tech on January 16, 1991, via Agent Bouffard, "depicts children under the age of 12 years old engaged in sexually explicit conduct as defined by law, and the production of which involved children under the age of 12 engaged in sexually explicit conduct." In light of this stipulation, the district court denied the government's request to show to the jury the subject videotape that Agent Bouffard had delivered to Harvey.

At the end of the government's case, Harvey moved for a judgment of acquittal, arguing that he had been entrapped as a matter of law. The district judge denied

the motion, and Harvey presented a defense case. His defense was twofold: 1) that he did not know the package he received from Agent Bouffard contained a sexually explicit videotape; and 2) that he was entrapped into committing the crime by federal agents. Harvey testified on his own behalf; he stated that he was forty-three years old and self-employed at a North Syracuse construction company and that Literal Tech was part of that company. He testified that, approximately five to six years before trial, he began acquiring X-rated videotapes to enhance his sex life with his wife and that he purchased the videotapes "on the basis of things that might be things that we could try or learn how to do better and on the basis after awhile of particular stars that we, one or the other of us liked, or on the basis of something sounding humorous and interesting." Harvey further testified that "sometimes the title would be relevant if it was something that we thought we might want to explore on and get better at, oral sex or something like that, or in some occasion if the tape indicated that it was humorous, something like that. The titles were never very indicative of anything."

He stated that, prior to November 1989, he had never ordered any videotapes that depicted minors in sexually explicit conduct, because "[t]hat was not even close to an area of interest." Harvey was asked, "Did there come a time in fact, though, that your interest was spurred in some respects in regard to child pornography?" He replied, "With this government situation here."

As to his receipt of the government's introductory letter mailed in October 1989, Harvey testified that his interest was spurred because "[w]ell, they're clearly talking about unusual or hard to get tapes which was something that might have benefited the situation between my wife and I[,] and I was very curious about what hard to get or hard to find or whatever might mean."

It was stipulated that Harvey had written and mailed to the post office box in Belgium all the correspondence that bore

his name or the name of Brent Purtzer. This correspondence was admitted into evidence. Harvey testified that in December 1990, he was told by his regular letter carrier that he was being surveilled by postal investigators. He determined that his order to Artiste Internationale was the only thing in his life that might cause him to be the subject of a postal investigation. He stated that he closed his post office box soon after his conversation with the letter carrier because he no longer wanted to receive the order.

Harvey acknowledged that he placed an order with Artiste Internationale after examining some descriptions of the tapes that were offered for sale. The materials ordered were videotapes of various young girls engaging in explicit sexual activity with men. Harvey stated that, based upon his past experience, he was skeptical that the materials he would receive would be what had been described. Harvey acknowledged that on January 16, 1991, he signed the receipt when the package containing the subject videotape was delivered to him. After Agent Bouffard left the package at his office, upon looking at the label, Harvey realized that it had come from Belgium. He then drove home and watched about thirty or forty seconds of the videotape "to see if this was for real or not." He "could not take much more than that," and he wondered what to do with the videotape. He testified that he considered throwing it out but that "didn't seem to be the right thing," and he decided that that night he would contact a friend who is a retired detective with the child abuse unit of the Onondaga County Sheriff's Department to have his friend come out and talk about what to do. Harvey estimated that he was in the house for approximately half an hour before he left and drove back to work.

On cross-examination by the prosecutor, Harvey testified that he suspected that he was ordering something illegal from Artiste Internationale, and stated that he was being as specific as he could be in the letters as to the type of videotapes he wanted. He stated that the four videotapes he ordered had been selected randomly, however, he acknowledged that the order form gave the exact ages of the children involved in those videotapes. When Harvey was asked by the prosecutor if the October 1989 introductory letter sent by the Customs Service referred "to a lot of illegal type tapes, ... like bestiality, rape tapes, what we've discussed, the excrement tapes," he responded, "I was not aware of what might have been meant by this with any specificness [sic], what was illegal, what wasn't illegal, anything of the kind and my curiosity was peeked [sic] by it." The prosecutor asked Harvey various other questions regarding the contents of some of the X-rated videotapes found at his home, *e.g.*, a sixteen-millimeter film purportedly depicting a dog having sex with a woman, and videotapes of people urinating on each other and swallowing each other's urine. Harvey stated that he did not remember possessing the bestiality tape and that when he ordered the latter tapes he "never ordered expecting that."

Thereafter, the district judge instructed the jury regarding the elements of the crime charged and informed them that Harvey had stipulated to three of the four elements—namely, that the subject videotape depicted children under the age of twelve years engaged in sexually explicit conduct as defined by law, that the production of the subject videotape involved children under the age of twelve engaged in sexually explicit conduct, and that the subject videotape had been transported in interstate commerce. The jury was instructed that it had to determine whether Harvey knowingly received a visual depiction that he had reason to believe contained a minor engaging in sexually explicit conduct, and whether Harvey was entrapped. After deliberating for approximately five and one-half hours, the jury returned with a verdict of guilty. Harvey was sentenced to eighteen months' imprisonment, two years' supervised release, and fined $10,000. According to the government, in light of *Jacobson v. United States*, —— U.S. ——, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992), the district court stayed execution of the sentence pending appeal. This appeal followed.

## DISCUSSION

On appeal, Harvey contends that the government violated his fourth and fifth amendment rights by targeting him for investigation without any cause or reason to believe that he was or had engaged in, or was likely to engage in, unlawful activity. He also claims that he was entrapped as a matter of law, relying upon *Jacobson v. United States.* Finally, Harvey maintains that he was denied a fair trial by the district court's improper admission of prejudicial evidence and by prosecutorial misconduct.

### I. Targeting a Suspect

Harvey argues that reasonable cause is required under the fourth amendment and under the due process clause of the fifth amendment before the government may target a suspect for criminal investigation. Without such reasonable cause, the government's mailing of the introductory letter in early October 1989 and subsequent correspondence, he suggests, constituted improper selective investigation and prosecution of persons who were known to be exercising their first amendment right to legally purchase pornography.

We reject this argument. This Court considered a similar issue in a pre-*Jacobson* appeal, namely, *United States v. Chin,* 934 F.2d 393 (2d Cir.1991), which was also an appeal from a conviction arising from charges of violations of the laws against child pornography. In *Chin,* the United States Postal Inspection Service conducted an undercover investigation of the child pornography industry. Apparently, because he had previously responded to advertisements regarding adult pornographic literature, Chin became a target of a Postal Inspection Service's undercover investigation. Chin received a solicitation letter and questionnaire from undercover postal inspectors, inquiring into Chin's sexual practices and interests. Chin completed the questionnaire, listing "Pre–Teen sex—Heterosexual" as his top preference. Thereafter, one John McDermott, an undercover postal inspector who was posing as "Ted from Medford," wrote Chin and informed him that "he had 'hot photos of girl subjects both white and oriental, preteen and teen.'" Chin eventually informed McDermott, via letter, that he would be travelling to Amsterdam and offered to "search[ ] out Lolita material" for him. *Id.* at 395. After Chin's return from the trip, he sent McDermott a copy of one of the magazines he had purchased in Amsterdam. Chin was arrested as a result of this mailing, and convicted by a jury of transporting child pornography in foreign and interstate commerce. *Id.* at 396.

On appeal, Chin contended that the postal authorities violated his right to privacy, as guaranteed by the due process clause of the fourteenth amendment, when they targeted him and made him the subject of an undercover operation without having any basis for suspecting that he was engaging in or was likely to engage in criminal activity. In affirming Chin's conviction, we observed that it was the fourth amendment's prohibition against unreasonable searches and seizures, rather than the privacy guarantees incorporated in the fourteenth amendment's due process clause, which governed his claim. After observing that McDermott's conduct did not infringe upon Chin's protected fourth amendment privacy interests, we cited *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968) (relying on the fourth amendment right to "personal security") and noted that "the Supreme Court has routinely upheld suspicionless police activity where no Fourth Amendment interests are implicated, *see, e.g., Michigan v. Chesternut,* 486 U.S. 567, 576, 108 S.Ct. 1975, 1981, 100 L.Ed.2d 565 (1988) (upholding suspicionless pursuit of individual where pursuit did not constitute a seizure under the Fourth Amendment)" and stated, "[a]s such, there is no basis for imposing a requirement of individualized suspicion on law enforcement officials for undercover investigations implicating no Fourth Amendment concerns." 934 F.2d at 397 (citations omitted). We went on to conclude that, even if the due process clause required some individualized suspicion before government agents could target an individual for intrusive undercover investigation, on the facts of

*Chin*, that requirement would not require reversal of his conviction because there was no constitutionally cognizable invasion of his privacy as a result of the initial mailing to Chin, and, as to the later mailings to Chin, these communications all took place after Chin had ordered child pornography and thus were supported by a reasonable belief that Chin was likely to violate the law. *Id.* at 397–98.

Herein, the United States Customs Service learned that approximately forty to fifty of the 5,700 individuals on NMPC's current mailing list had specifically requested child pornography. Although an investigation of NMPC did not reveal either that the company was engaged in the distribution of child pornography or that Harvey was one of the customers who had requested child pornography from NMPC, an introductory letter was mailed to him and everyone else on NMPC's mailing list. Like the appellant in *Chin*, Harvey argues that the government did not have a reasonable basis for targeting him because it had no reason to suspect that he had violated, was violating, or was likely to violate the laws against child pornography.

■ The federal appellate courts that have considered this issue all appear to have concluded that the Constitution does not require either a reasonable basis or reasonable suspicion of wrongdoing by a suspect before the government can begin an undercover investigation of that person. *See United States v. Allibhai*, 939 F.2d 244, 249 (5th Cir.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 967, 117 L.Ed.2d 133 (1992); *United States v. Osborne*, 935 F.2d 32, 35–36 (4th Cir.1991); *Chin*, 934 F.2d at 397; *United States v. Luttrell*, 923 F.2d 764, 764 (9th Cir.1991) (en banc), *cert. denied*, — U.S. ——, 112 S.Ct. 1558, 118 L.Ed.2d 207 (1992); *United States v. Jacobson*, 916 F.2d 467, 469 (8th Cir.1990) (en banc), *rev'd on other grounds*, — U.S. ——, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992); *United States v. Jenrette*, 744 F.2d 817, 824 n. 13 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1099, 105 S.Ct. 2321, 85 L.Ed.2d 840 (1985); *United States v. Gamble*, 737 F.2d 853, 860 (10th Cir.1984); *United*

*States v. Thoma*, 726 F.2d 1191, 1198 (7th Cir.), *cert. denied*, 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984); *United States v. Jannotti*, 673 F.2d 578, 608–09 (3d Cir.) (en banc), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). We believe that *Jacobson* provides no principled basis for us to depart from *Chin*.

Referring to one of the dissents in the Eighth Circuit's en banc *Jacobson* decision, which reiterated the view of the initial panel of the Eighth Circuit, *see* 916 F.2d at 472 (Heaney, J., dissenting), Harvey argues that the government's lack of a basis for targeting Jacobson was the ground upon which a panel of the Eighth Circuit concluded that he was entrapped as a matter of law. The panel's judgment and opinion, however, were vacated, 899 F.2d 1549 (8th Cir.1990), and Jacobson's conviction was affirmed by the Eighth Circuit, sitting en banc. 916 F.2d at 470. The Supreme Court granted *certiorari*. *See* — U.S. ——, 111 S.Ct. 1618, 113 L.Ed.2d 716 (1991). According to the Court, "[t]he sole issue [before it was] whether the Government carried its burden of proving that petitioner was predisposed to violate the law *before* the Government intervened." *Jacobson*, — U.S. at —— – —— n. 2, 112 S.Ct. at 1540–41 n. 2 (emphasis in original). A five justice majority of the Court determined that the prosecution's evidence of Jacobson's predisposition garnered prior to the initiation of its undercover campaign, as well as the predisposition evidence developed during the government's investigation of Jacobson, failed to carry the prosecution's burden of proving that Jacobson was disposed to commit the crime independent of the government's coaxing. *Id.* at —— – —— & —— n. 3, 112 S.Ct. at 1541–43 & 1542 n. 3. The Court reversed Jacobson's conviction because it determined that "[r]ational jurors could not say beyond a reasonable doubt that petitioner possessed the requisite predisposition prior to the Government's investigation and that it existed independent of the Government's many and varied approaches to petitioner." *Id.* at ——, 112 S.Ct. at 1543.

Jacobson's petition for a writ of *certiorari* also presented the question of whether

the government needs some cause, reason or suspicion to subject someone to an undercover operation; however, the Court granted the petition limited solely to whether Jacobson was entrapped as a matter of law.[3] It is arguable that the inquiry of whether there was sufficient evidence to show that the government had cause, reason or suspicion to subject someone to an undercover investigation and the inquiry of whether there was sufficient evidence to show beyond a reasonable doubt that a defendant was predisposed to violate the law before the government presented an opportunity for him to commit the crime charged each requires similar proof. However, we do not discern that *Jacobson* specifically requires the government to demonstrate that it had some cause, reason or suspicion prior to making a person the target of an undercover investigation.

The dissent in *Jacobson* claimed that the majority "redefines 'predisposition,' and introduces a new requirement that Government sting operations have a reasonable suspicion of illegal activity before contacting a suspect." *Jacobson*, —— U.S. at ——, 112 S.Ct. at 1544 (O'Connor, J., dissenting). The dissent noted that the Court had held in previous cases that "a defendant's predisposition is to be assessed as of the time the Government agent first suggested the crime, not when the Government agent first became involved,"[4] but that in *Jacobson*, "the Court h[e]ld[ ] that the Govern-

ment must prove not only that a suspect was predisposed to commit the crime before the opportunity to commit it arose, but also before the Government came on the scene." *Id.* at ——, ——, 112 S.Ct. at 1544, 1545 (citation omitted). The dissent continued,

[t]he rule that preliminary Government contact can create a predisposition has the potential to be misread by lower courts as well as criminal investigators as requiring that the Government must have sufficient evidence of a defendant's predisposition *before it ever seeks to contact him.* Surely the Court cannot intend to impose such a requirement, for it would mean that the Government must have a reasonable suspicion of criminal activity before it begins an investigation, a condition that we have never before imposed. The Court denies that its new rule will affect run-of-the-mill sting operations, and one hopes that it means what it says.... In short, the Court's opinion could be read to prohibit the Government from advertising the seductions of criminal activity as part of its sting operation, for fear of creating a predisposition in its suspects. That limitation would be especially likely to hamper sting operations such as this one, which mimic the advertising done by genuine purveyors of pornography. No doubt the Court would protest that its opinion does not stand for

---

**3.** The first question presented in the *certiorari* petition was:

> Where the Government knows the defendant has committed no crime, is not planning to commit a crime and has never engaged in any criminal activity, whether the Government needs some cause, reason or suspicion to make petitioner the subject of five undercover attempts to induce the defendant to commit the offense of receiving child pornography through the mails extending over the course of twenty seven months before the petitioner finally purchases and accepts delivery of a single magazine which has been manufactured, advertised, sold and delivered to him by the Government?

Petition for a Writ of Certiorari, *Jacobson v. United States*, (No. 90–1124), at i. The petition was granted, limited to Question Three. *Jacobson v. United States*, —— U.S. ——, 111 S.Ct. 1618, 113 L.Ed.2d 716 (1991). Question Three stated:

> Where the Government has attempted and failed in three separate undercover operations covering two years of testing and soliciting to persuade the defendant to receive child pornography through the mails and the petitioner does not qualify either under the Attorney General's Guidelines for the conduct of undercover operations or the guidelines established by the Postal Inspectors for inclusion in the undercover operation in which petitioner is finally ensnared, whether the petitioner has been entrapped as a matter of law?

Petition for a Writ of Certiorari, *Jacobson v. United States*, (No. 90–1124), at i.

**4.** A similar point was made in *United States v. Williams*, 705 F.2d 603, 618 n. 9 (2d Cir.) (suggesting that cultivating relationship with target preparatory to presenting criminal opportunity is not inducement to commit crime), *cert. denied*, 464 U.S. 1007, 104 S.Ct. 524, 525, 78 L.Ed.2d 708 (1983).

so broad a proposition, but the apparent lack of a principled basis for distinguishing these scenarios exposes a flaw in the more limited rule the Court today adopts. *Id.* (emphasis in original and citation omitted).[5]

Notwithstanding the views expressed in the dissent, it is clear that *Jacobson* did establish that "[w]here the Government has induced an individual to break the law and the defense of entrapment is at issue, ... the prosecution must prove beyond a reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." —— U.S. at ——, 112 S.Ct. at 1540. Harvey has not persuaded us that *Jacobson* mandates that we must depart from our ruling in *Chin* and require the government to show, in addition to predisposition, that it had reasonable cause prior to targeting a suspect for criminal investigation. Further, in any event, as we discuss below, Harvey stated quite clearly his interest in materials involving "young," "younger," and "youngest performers" *prior* to the government agents dangling child pornography materials before him in its offerings; and later the *promptness* of his response to the advertised child pornography materials was itself highly significant.

## II.  Entrapment as a Matter of Law

Harvey argues that, in addition to being targeted for investigation without cause, he was entrapped as a matter of law. He claims that his possession of the simulated child pornography was not evidence from which the jury could properly conclude that he was ready and willing to commit the offense of receiving child pornography. He argues that the jury was permitted to draw the inference that he was ready and

willing to commit this offense based upon his possession of X-rated videotapes, which, he asserts, was not unlawful. In support of this claim, he notes that the government did not present any evidence that he ever had sought to obtain child pornography prior to his receipt of the October 1989 introductory letter and later correspondence from Artiste Internationale.

"[A] valid entrapment defense has two related elements: government inducement of the crime, and lack of predisposition on the part of the defendant to engage in the criminal conduct." *Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988). When a defendant claims that he was entrapped as a matter of law, he essentially contends that the evidence was insufficient to permit the jury to rationally conclude that he was predisposed, *i.e.*, "ready and willing without persuasion" to commit the crime charged and "awaiting any propitious opportunity." *United States v. Williams*, 705 F.2d 603, 613 (2d Cir.) (citation and quotation marks omitted), *cert. denied*, 464 U.S. 1007, 104 S.Ct. 524, 525, 78 L.Ed.2d 708 (1983).

■ It is clear to us that the jury, in this case, was free to conclude from the government's evidence that Harvey's requests for a catalog of material featuring "younger performers," "young performers," and "your youngest performers" were oblique requests for child pornography reflecting predisposition beyond a reasonable doubt. Further, Harvey's prompt acceptance of the government-sponsored invitation to purchase child pornography, as reflected in the order form, provided sufficient evidence for the jury to conclude that the prosecution had proven beyond a reason-

---

**5.** According to the 1992 Constitutional Law Conference, Professor Yale Kamisar has

> questioned dissenting Justice O'Connor's view that the majority opinion [in *Jacobson*] indicates that the government must have sufficient evidence of a defendant's predisposition "before it ever seeks to contact him." Although the majority opinion can be read that way, Kamisar said that's not what it means. The rule that the government may solicit an

> offense without "probable cause" or "reasonable suspicion" that the target is engaged in criminal activity is supported by the great weight of authority. Despite Jacobson's "fuzzy" language, Kamisar said the court does not appear to have changed that rule, and probably would not do so without explicitly saying so.

*Constitutional Law Conference*, 61 U.S.L.W. 2237, 2242 (Oct. 27, 1992).

able doubt that Harvey was predisposed to commit the crime charged.

Only days after Harvey was first contacted by government agents via the early October 1989 letter introducing Artiste Internationale, on October 14, 1989, he sent a letter requesting "a catalog or other literature" from the company. On November 27, 1989, Harvey wrote another letter to Artiste Internationale, requesting a catalog. The government responded, apparently sometime between November 27, 1989 and December 12, 1989, with the "specific interest" letter, requesting that Harvey "specify the areas in which [he was] interested." In three subsequent letters, dated December 12, 1989, January 24, 1990 and March 6, 1990, Harvey requested catalogs featuring "younger performers," "young performers," and "your youngest performers." Up to this point, the government had not solicited Harvey's interest in child pornography material. However, having clearly signaled his interest in such material, between March 6 and April 3, 1990, the government sent him, a listing of, *inter alia*, available videotapes, each of which described at least one child engaging in explicit sexual activity. Thus, it was only after his prior signals that Harvey, in the words of *Jacobson*, —— U.S. at ——, 112 S.Ct. at 1546, was "first approached by Government agents" with respect to the availability of child pornography material. Thereafter, on April 3, 1990, after Harvey had received and examined the contents of the government-mailed catalog advertising, *inter alia*, videotapes, he ordered four videotapes, each of which depicted a young girl engaging in explicit sexual activity with at least one man. Even thereafter, Harvey sent four follow-up letters during the next five months inquiring about the status of his April 3, 1990 order. Months later, on January 16, 1991, he signed for and accepted delivery of the subject videotape.

Based upon Harvey's *prompt* response to the government's single invitation to him to purchase child pornography, the jury could rationally find that he possessed the requisite predisposition beyond a reasonable doubt. Such was not a permissible

inference in *Jacobson* since, in that case, it took over two and one-half years of various governmental efforts directed toward the defendant before he placed an order for child pornography. *Jacobson* did not change the law so that when a suspect *promptly* avails himself of a government-sponsored opportunity to commit a crime, that suspect thereafter can successfully claim he was entrapped as a matter of law. *See Jacobson*, —— U S. at ——, 112 S.Ct. at 1541 ("where the defendant is simply provided with the opportunity to commit a crime, the entrapment defense is of little use because the ready commission of the criminal act amply demonstrates the defendant's predisposition"); *see also United States v. LaChapelle*, 969 F.2d 632, 634–36 (8th Cir.1992) (rejecting defense of entrapment as a matter of law and affirming conviction arising out of Artiste Internationale sting based upon defendant's "prompt[ ] and independent[ ] inquir[y] about child pornography" and ordering "such material at first available opportunity").

### III.   Evidentiary Rulings

Harvey claims that the district court's admission of prejudicial evidence denied him a fair trial. We reject that claim in part, and accept it in part, and we remand for a new trial.

First, Harvey contends that the district court erred in permitting the prosecutor to elicit the entire list of descriptions of child pornography contained on the order form from Artiste Internationale. He claims that the recitation of these descriptions seriously prejudiced him since he had stipulated that he had received the subject videotape, and thus any probative value of such descriptions was minimal. Secondly, he argues that the evidence regarding the simulated child pornography should not have been admitted as evidence of predisposition. Thirdly, Harvey strongly contends that the testimony concerning the contents of the adult pornography videotapes seized from his residence, particularly the testimony of people engaging in gross acts involving human waste, was in-

troduced by the government prosecutors in order to create antagonism and to severely prejudice the jury against him. He contends that all of this evidence, coupled with some of the prosecutor's questions to him on cross-examination (*e.g.,* "Well, Mr. Harvey, isn't it true that you corresponded with a woman named Maria in your capacity as Multiple Dimensions and asked her for a—for price quotes on such things as overnights at the Marriot[t], and lunch and a blowjob, and at my house?"; "And you testified that you don't recall any tape of bestiality that you had except possibly a tape that a friend gave you[,] is that right?"; "Do you remember a 16–millimeter film with a picture on the front of a dog having sex with a woman?"; "And you also testified that you don't remember any tapes you had of so-called golden showers, that is people urinating on each other and swallowing each other's urine, right?"), deprived him of his fundamental right to a fair trial and created a strong possibility that he was convicted based upon the jury's prejudice and disgust rather than upon properly admitted evidence.

### A. General Principles

■ To rebut a claim of entrapment, the prosecution is generally permitted to introduce evidence that the defendant was predisposed to commit the offense. *See Sherman,* 356 U.S. at 373, 78 S.Ct. at 821; *see also Sorrells v. United States,* 287 U.S. 435, 451, 53 S.Ct. 210, 216, 77 L.Ed. 413 (1932) ("[I]f the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue."). Predisposition evidence can be established by evidence of a defendant's past conduct; this past conduct should be "near enough in kind to support an inference that his purpose included offenses of the sort charged;" although it is not necessary that the past conduct be precisely the same as that for which the defendant is being prosecuted. *United States v. Sherman,* 200 F.2d 880, 882 (2d Cir.1952). Finally, we review the admission of potentially prejudicial evidence, such as predisposition evi-

dence, for an abuse of discretion. *See United States v. Gantzer,* 810 F.2d 349, 351 (2d Cir.1987).

### B. Descriptions of Child Pornography in Artiste Internationale's Order Form

■ Harvey objected to Agent Rich's reading to the jury of the titles and descriptions of the contents of advertised videotapes listed on the order form sent to Harvey by the government agents on behalf of Artiste Internationale. The order form that was completed and mailed by Harvey was part of his correspondence to the post office box in Belgium and his defense attorney had stipulated to its admission when he stipulated to the admission of all of Harvey's correspondence. Moreover, the descriptions of the content of the videotapes advertised on the order form were pertinent to the jury's determination of whether Harvey had knowingly ordered child pornography. Further, Harvey's stipulation to his receipt of the subject videotape did not remove from the jury's consideration the question of whether he "knowingly received" a visual depiction of a minor engaging in sexually explicit conduct. The district court did not abuse its discretion in allowing this challenged testimony to be presented.

### C. Simulated Child Pornography

We have somewhat more difficulty with the government's elicitation of the testimony and presentation of evidence regarding the simulated child pornography materials as evidence of predisposition. We refer specifically to: (a) the seven videotapes described generally by Agent Rich and, more particularly by, Inspector Walmsley, including two videotapes identified by title and specifically referred to as from NMPC's "Girlie Watcher Series;" and (b) the eight-millimeter film described by Walmsley. We include also in this category the videotape from NMPC depicting underage girls on a nudist beach, although that videotape does not depict sexually explicit conduct.

Harvey notes that in *Jacobson* the Supreme Court wrote of Jacobson's posses-

sion of Bare Boys magazine, which contained photographs of nude preteen and teenage boys:

> [T]his is scant if any proof of petitioner's predisposition to commit an illegal act.... It may indicate a predisposition to view sexually-oriented photographs that are responsive to his sexual tastes; but evidence that merely indicates a generic inclination to act within a broad range, not all of which is criminal, is of little probative value in establishing predisposition.

—— U.S. at ——, 112 S.Ct. at 1541.

While it is true that the presentation of the entrapment defense permits "an appropriate and searching inquiry" into a defendant's conduct, *Sorrells*, 287 U.S. at 451, 53 S.Ct. at 216, one must be mindful both of *Jacobson*'s caution and that, even as to erotic material, a person's possession of some of this material for non-commercial use may well be entitled to protection under the first amendment. As the Supreme Court has stated, "[i]f the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch. Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds." *Stanley v. Georgia,* 394 U.S. 557, 565, 89 S.Ct. 1243, 1248, 22 L.Ed.2d 542 (1969) (Marshall, J.). In this case, our inquiry must be even more conscientious because, as the government acknowledges in its appellate brief, Harvey was not charged with unlawful receipt of obscene material, as such, nor with causing the unlawful mailing of obscene material based upon his possession of the simulated child pornography. Thus, there is no contention that Harvey's possession of the simulated child pornography was illegal. We recognize the government's argument that his possession of these materials may demonstrate that Harvey had an *interest* in child pornography. We are also mindful of *Jacobson*'s admonition that "[e]vidence of predisposition to do what [is] lawful is not, by itself, sufficient to show predisposition to do what is ... illegal...." —— U.S. at ——, 112 S.Ct. at 1542. Consequently, if

this were the government's principal evidence of alleged wrongdoing, we do not believe that, standing alone, the possession of the simulated child pornography material would demonstrate a predisposition to obtain child pornography materials illegally. Indeed, presented with a similar situation, a district judge might well consider instructing a jury as to this distinction.

Once a defendant is charged in an indictment, the government generally may only present evidence relevant to the conduct for which the defendant is being prosecuted. This does not mean predisposition evidence need be precisely the same as that for which the defendant is being prosecuted, *Sherman,* 200 F.2d at 882; nor must such evidence be limited to punishable criminal acts. *Gantzer,* 810 F.2d at 352. With this in mind, we do not believe that the district court abused its discretion in admitting the simulated child pornography evidence. Harvey did not claim in the district court, nor does he claim on appeal, that no reasonable person would have mistaken any of the females in these simulated child pornography materials as being underage. Also, Harvey does not challenge either Agent Rich's or Inspector Walmsley's conclusory testimony that the females in the films were dressed to appear underage. In light of this, we are unwilling to conclude that the admission of the simulated child pornography evidence unduly prejudiced Harvey. The district court did not abuse its discretion in admitting evidence concerning the simulated child pornography.

#### D. *Testimony Concerning X–Rated Material*

We are, however, persuaded that the presentation of evidence concerning the contents of some of the adult X–rated videotapes seized from Harvey's residence was so prejudicial that it denied him his right to a fair trial.

The trial court erred in admitting the evidence concerning the descriptions of the contents of the X–rated videotapes, beyond those that involved child pornography and simulated child pornography. Over defense counsel's objection, there was testi-

mony, essentially all elicited by the government, that some of the videotapes seized from Harvey's residence depicted people performing gross acts involving human waste, and people engaging in bestiality and sadomasochism. Inspector Walmsley was allowed, over objection, to read to the jury the titles of more than ten adult X-rated films and videotapes found in Harvey's possession, which he had received through the mail from NMPC, and from two other mail-order companies. Further, the related order forms and videotapes were received in evidence. Yet, during the course of the trial, the only disputed essential issues for the jury to decide were whether Harvey had "knowingly received" child pornography, within the meaning of 18 U.S.C. § 2252(a)(2), and whether he was entrapped.

The above-described X-rated material, which did not involve either child pornography or simulated child pornography, did not bear on the disputed trial issues, and thus was not relevant. *See* Fed.R.Evid. 401 and 402. Moreover, it was wholly unnecessary for the government to prove the types of products NMPC sold to its customers, as it was established early in the trial, and was undisputed, that NMPC sold erotic materials through the mails and that Harvey's name was on its current mailing list because he had purchased one or more items from NMPC. Harvey was not charged with a violation of any law with respect to these videotapes, and, as far as we can tell, he may even have had a right to possess and to view some or all of these X-rated videotapes in his home. Further, some of the prosecutor's questions to Inspector Walmsley on re-direct examination were improper (*e.g.,* "Mr. Walmsley, do you have any films depicting people eating excrement? ... And you found such films in Mr. Harvey's home, didn't you?"; "And do you have any—do you keep in your home any films depicting bestiality and sadomasochism? ... And did you find films like that in Mr. Harvey's home?"; "How about so-called golden showers film[s], can you explain to the jury what those are? ... And did you find those in the defendant's home?"), as well as some of her questions to Harvey on cross-examination, *see supra.*

In both instances, these questions and the answers to them concerned material for which Harvey was not being prosecuted and that did not bear on the disputed trial issues. We have little difficulty in concluding that the likely effect of this evidence was to create disgust and antagonism toward Harvey, and resulted in overwhelming prejudice against him.

Under Rules 401 and 403 of the Federal Rules of Evidence in order for evidence to be admissible, it must be relevant and its prejudicial effect must not substantially outweigh its probativeness. *See United States v. Jamil,* 707 F.2d 638, 644–45 (2d Cir.1983). We consider the evidence concerning the descriptions of the contents of the adult X-rated videotapes, beyond those that involved either child pornography or simulated child pornography, to have been irrelevant, and we can discern no probativeness against which to weigh its overwhelmingly prejudicial effect. *See United States v. Borello,* 766 F.2d 46, 59–60 (2d Cir.1985). Unlike *LaChapelle,* a case arising out of the same sting operation involved herein, in which erroneous admission of a single videotape of child pornography, the possession of which was lawful when acquired, was deemed by the Eighth Circuit to be harmless error, 969 F.2d at 638, the materials introduced against Harvey were highly prejudicial and posed a substantial risk of inflaming the jury. Consequently, despite the other evidence presented by the government, we do not believe the presentation of evidence concerning the descriptions of the contents of the adult X-rated videotapes, which did not involve either child pornography or simulated child pornography, was harmless beyond a reasonable doubt. It is arguable that some of Inspector Walmsley's testimony could have supported Harvey's defense counsel's suggestion that Harvey was "a sexual indiscriminate," however, the detailed descriptions of the adult X-rated material were first elicited by the government and were improper and, in any event, clearly were more prejudicial than probative under Fed.R.Evid. 403. *See United States v. Schiff,* 612 F.2d 73, 80–83 (2d Cir.1979). Though the evidence of predisposition was not insubstantial, the jury faced a fair issue as to wheth-

er predisposition was proven beyond a reasonable doubt, and we are unwilling to conclude that the jury would have convicted in the absence of the prejudicial evidence gratuitously presented by the prosecutor. Due to the admission of this evidence, and improper questions posed by the prosecutor, the appellant was denied his right to a fair trial.

### CONCLUSION

We agree that "[t]here can be no dispute about the evils of child pornography or the difficulties that laws and law enforcement have encountered in eliminating it.... Likewise, there can be no dispute that the Government may use undercover agents to enforce the law. '... Artifice and stratagem may be employed to catch those engaged in criminal enterprises.' *Sorrells v. United States*, 287 U.S. 435, 441 [53 S.Ct. 210, 212, 77 L.Ed. 413] (1932)." *Jacobson*, —— U.S. at ——, 112 S.Ct. at 1540 (citations omitted).

Notwithstanding this, we are constrained to conclude that a substantial amount of the materials and testimony received into evidence herein denied the appellant his fundamental right to a fair trial. We reverse the judgment of the district court and remand for a new trial.