56 F.3d 62
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
William J. BARBER, Jr., Defendant-Appellant.
 No. 94-5698.
 United States Court of Appeals, Fourth Circuit.
 Argued April 12, 1995.
Decided June 5, 1995.
 
 Before ERVIN, Chief Judge, WIDENER, Circuit Judge, and WARD, Senior United States District Judge for the Middle District of North Carolina, sitting by designation.
 OPINION
 ERVIN, Chief Judge:
 
 
 1
 William J. Barber, Jr. appeals from his conviction under 18 U.S.C. Sec. 2252(a)(2) and (b)(1) for receiving child pornography in the mail. Barber raises three issues on appeal. First, he claims that the district court committed reversible error by not allowing him to present the defense of entrapment to the jury. Second, he alleges that the district court erred in allowing the jury to view a one-minute portion of one of the child pornographic videos he had received in the mail. Finally, he argues that he was prejudiced by the prosecutor's closing statements on rebuttal. Because we find that none of these issues merit reversal of Barber's conviction, we affirm.
 
 I.
 
 2
 In the fall of 1992, the Postal Inspector, as part of an undercover investigation, placed a classified advertisement in Video Xcitement, an adult magazine. The magazine's classified section included the following disclaimer: "Video Xcitement will not publish any advertisements and/or photos that deal in any way whatsoever with child pornography and/or participation by minors." The Postal Inspector's ad was placed under the heading of "Bizarre for Sale." It read: "Looking for something different, something special, something rare? If so, let me hear from you." It also included a return address in the Virgin Islands.
 
 
 3
 Barber responded to the ad on October 31, 1992, by sending his name and address in a hand written letter that stated "I am looking for something different." The Postal Inspector responded on November 9, 1992, by sending Barber a form letter and a customer interest checklist. The letter stated that "if exotic erotica isn't your thing, please just return the checklist marked not interested and we will purge your name entirely from our files." On the checklist, however, Barber checked the block indicating that he was interested in the material and further checked an interest in VHS video, color photo sets, and photo magazines. He also checked a preference for female models in the following age categories: sixty, forty to sixty, twenty-five to forty, eighteen to twenty-five, fifteen to seventeen, twelve to fourteen, nine to eleven, five to eight, and under five. Under the types of sexual activity category, he checked masturbation, straight sex, anal action, golden showers (urination), scat (defecation), and toys. Under the combination of models and type of action, he checked man/woman, woman/woman, girl/girl, and woman/girl.
 
 
 4
 After completing every section of the checklist and selecting every category of female child pornography, Barber signed the checklist. Immediately above his signature, a disclaimer stated:
 
 
 5
 I certify I am an adult and I desire to purchase and receive sexually explicit materials. I understand that the products you are selling feature exotic, XXX subject matter and are considered illegal under current laws. I do not want the notation "sexually-oriented material" to appear on the outside of any mailing you send to me.
 
 
 6
 Barber mailed this checklist on November 13, 1992. Upon receipt, the Postal Inspector sent Barber a catalog that included a list of titles and prices, an order form, and a general information pamphlet. A form letter stated that a price list was enclosed and that orders could be accepted only on the enclosed order form. The general information pamphlet contained a "notice" stating that Barber had expressed an interest in receiving sexually explicit material featuring teens and/or preteens, and if Barber did not wish to receive such lists in the future, he should notify the company and his name would be deleted from the mailing list. The pamphlet also contained an "About Our Products" section which stated that the material contained "genuine, uncensored sex action." It also admonished that "if you are offended by youthful sex activity, do not order these items." The pamphlet mentioned the discount available for volume purchases and contained instructions about how to order. The title and price list graphically described the types of sexual activity depicted and the approximate ages of the various participants in each film or photo.
 
 
 7
 Barber completed the purchase order form and ordered eleven videotapes of child pornography. He ordered all eleven films offered in the catalog that featured young females, as well as three child pornography photo sets with young females and one pornography photo magazine with young females. The total price was $335 dollars. Barber subtracted the 20% volume discount and enclosed a check for $268.
 
 
 8
 The Postal Inspector acknowledged Barber's letter on Dec. 12, 1992, thanking him for his order and indicating it would be sent within four to six weeks. The Postal Inspector then prepared an affidavit for a search warrant, which he obtained on January 14, 1993. The pornographic material was delivered on that day to Barber's house. Barber's live-in girlfriend, Rebecca Barlowe, signed for the packages. A search of their home revealed only the communications with the Postal Inspector and the unopened package of videos, photo sets, and magazines, which were seized. Barber was called to the house and arrested. He never viewed the material prior to being arrested.
 
 
 9
 At trial, a one minute portion of one of the eleven tapes was played for the jury over the objection of defense counsel. Barber's request for a jury charge on entrapment was also denied. During the rebuttal portion of the closing argument, the prosecution stated that defense counsel had attempted to mislead the jury during closing arguments. Barber's attorney immediately objected and the prosecution apologized and pursued a completely different argument. The jury returned a guilty verdict against Barber, and the district court sentenced Barber to 28 months imprisonment.
 
 II.
 
 10
 We first address Barber's argument that the district court erred by failing to allow him to present the affirmative defense of entrapment to the jury. The defendant carries the initial burden of producing evidence that the government induced the criminal behavior by a defendant who was not otherwise predisposed to commit the crime. United States v. Osborne, 935 F.2d 32, 38 (4th Cir.1991). The burden then shifts to the government to prove predisposition beyond a reasonable doubt. Id. at 38; Jacobson v. United States, 503 U.S. 540, 549 (1992).
 
 
 11
 The defendant must prove "actual persuasion" and more than mere solicitation on the part of the government. Osborne, 935 F.2d at 38-39. If the defendant fails to meet his burden by producing evidence beyond a "mere scintilla," he is not entitled to submit the issue to the jury. See also id. at 39 ("The court may find as a matter of law that no entrapment existed, when there is no evidence in the record that, if believed by the jury, would show that the government's conduct created a substantial risk that the offense would be committed by a person other than one ready and willing to commit it.").
 
 
 12
 In affirming the Osborne district court's pre-trial finding that no entrapment existed as a matter of law, we noted that Osborne initially responded to an ad of his own volition and that "each successive transaction with the government required an affirmative decision on Osborne's part to continue, and at each stage he was provided the opportunity to withdraw." Id. at 38. We found that Osborne persevered until he received the tapes he had requested, which depicted girls between the ages of thirteen and seventeen engaging in sexual activity. Id.
 
 
 13
 Other circuits have also found the defense of entrapment unavailable under similar facts. In United States v. Harvey, 991 F.2d 981, 993 (2d Cir.1993), for example, the Second Circuit found that "Harvey's prompt response [reflected by the order form] to the government's single invitation to him to purchase child pornography" precluded him from claiming that he was entrapped as a matter of law. Likewise, in United States v. LaChapelle, 969 F.2d 632, 634-636 (8th Cir.1992), the Eighth Circuit rejected the defense of entrapment as a matter of law based upon the defendant's "prompt and independent inquiry" about child pornography and his ordering of "such material at first available opportunity." Even in Jacobson, the Supreme Court suggested that when a defendant "promptly avail[s] himself" of a criminal opportunity to order child pornography through the mail, "it is unlikely that his entrapment defense would have warranted a jury instruction." 503 U.S. at 550. Therefore, the law is settled that when a defendant promptly responds to an opportunity to order child pornography in the mail, the defendant is not entitled to a jury instruction on entrapment.
 
 
 14
 In this case, then, the district court properly refused defendant's request for a jury instruction on entrapment. The government merely ran an open-ended and vague ad which did not mention child pornography. Barber responded to this ad and was sent a checklist allowing him to indicate his interests. The checklist included child pornography, as well as other types of pornographic materials. Barber could have checked the box indicating he was not interested. He also could have selected pornographic material that did not involve children. However, he specifically selected child pornography, signing the checklist above a disclaimer indicating that he was an adult and acknowledging the material was illegal. After being sent an order form, he was given another opportunity to state that he was not interested. At this point, Barber selected only child pornography. Like the defendant in Osborne, at each stage of the government's operation, Barber was given an opportunity to withdraw. Instead, Barber pressed on until he received the material he requested. Under these facts, the district court correctly found that there was no entrapment as a matter of law.
 
 III.
 
 15
 The defendant also argues that the prosecutor's closing statements on rebuttal were improper and prejudicial. In response to defense counsel's suggestion in her closing remarks that the defendant had attended seminary, the prosecutor said:
 
 
 16
 You know, ladies and gentlemen, one of the reasons lawyers have a bad reputation these days is because they do things like what she just did. They stand in front of you and mislead you and they play games with you and tell you things that simply are not true. The first thing she told you that is not true--.
 
 
 17
 At this point, defense counsel interrupted with an objection. The court responded: "It may be objectionable, but I don't know what he's going to say. Go ahead." The prosecutor replied, "Sorry for that" and moved on to address the wholly separate issues of the advertisement in Video Xcitement and the disclaimer in the checklist.
 
 
 18
 Under United States v. Chorman, 910 F.2d 102, 113 (4th Cir.1990), the court must first determine whether the prosecutor's remarks were, in fact, improper; and secondly, whether the remarks were so prejudicial as to affect "the defendant's substantial rights so as to deprive the defendant of a fair trial." A prosecutorial statement is harmless if it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty, in the absence of the prosecutor's statement. United States v. Hasting, 461 U.S. 499, 510-511 (1983). The following factors are important in determining whether the statements were prejudicial: (1) whether the remarks have a tendency to mislead the jury and prejudice the accused; (2) whether they were isolated or extensive; (3) the strength of proof to establish guilt, in the absence of the remarks at issue; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters. United States v. Curry, 993 F.2d 43, 45-46 (4th Cir.1993); United States v. Harrison, 716 F.2d 1050, 1052 (4th Cir.1983), cert. denied, 466 U.S. 972 (1984).
 
 
 19
 Applying these factors to the prosecutor's statements demonstrates that the statements were not prejudicial. In fact, it is doubtful that the remarks were improper, since the defense counsel's objection stymied the actual accusation. Regardless, there was overwhelming evidence against Barber, and the remarks were isolated.
 
 IV.
 
 20
 Barber's third ground for appeal is that the district court abused its discretion by allowing the government to introduce and play a small portion of one of the pornographic videotapes. In support of his position, Barber relies on United States v. Harvey, 991 F.2d 981, 987 (2d Cir.1993), which involved a prosecution under 18 U.S.C. Sec. 2252(a)(2) for knowingly receiving child pornography in the mail. The facts of Harvey, however, are readily distinguishable from the facts of this case.
 
 
 21
 The parties in Harvey stipulated that the videotape delivered to the defendant by a special agent with the United States Customs Service contained child pornography. Id. at 987. In light of the stipulation, the district court did not allow any portion of the video to be shown to the jury. Id. Over defense objection, however, the district court allowed the prosecution to introduce testimony about the contents of adult pornographic videotapes seized from the defendant's residence. Id. This testimony did not involve child pornography or simulated child pornography, but rather "people performing gross acts involving human waste," sadomasochism, and bestiality. Id. at 996. On appeal, the court found this evidence of adult pornography to be inadmissible, since it did not involve child pornography and thus was not relevant. See Id. ("We can discern no probativeness against which to weigh its overwhelmingly prejudicial effect.").
 
 
 22
 In the present case, however, there was no stipulation that the material sent to Barber's house contained child pornography. In the absence of such a stipulation the only means for the government to prove an essential element of the offense--that the material Barber received contained child pornography--was to play a portion of the tape to the jury. Additionally, since the defendant contended that the videos consisted of simulated child pornography, it was essential that the prosecution prove the videotapes did in fact depict actual child pornography. Because only a one-minute portion of one of the eleven tapes was played, the prejudicial effect was relatively minor. More important, the relevance of the videotape was conceded by the defendant. Since the probative value of the tape substantially outweighed the prejudicial effect, the district court did not abuse its discretion.
 
 V.
 
 23
 Because we find no errors in the district court proceeding, we affirm Barber's conviction.
 
 AFFIRMED