**UNITED STATES of America,**

v.

**Alexander NOSOV, a/k/a "Sasha Dlinni," Vasiliy Ermichine, a/k/a "Vassya," a/k/a "Blondine," and Natan Gozman, a/k/a "Shmunka," Defendants.**

**No. S3 00 CR. 314(RLC).**

United States District Court, S.D. New York.

Sept. 17, 2002.

James B. Comey, United States Attorney for the Southern District of New York, New York City (Robert B. Buehler, Jamie L. Kogan, Assistant United States Attorneys, Of Counsel), for the United States of America.

Daniel Nobel, New York City (Daniel Nobel, Of Counsel), for Defendant Vasiliy Ermichine.

Donald Duboulay, New York City (Donald Duboulay, Of Counsel), for Defendant Alexander Nosov.

## OPINION

ROBERT L. CARTER, District Judge.

Defendant Vasiliy Ermichine, joined by defendant Alexander Nosov, moves pursuant to Rule 33, F.R.Crim.P for a new trial on two grounds: 1) that the court improperly limited their cross-examination of a cooperating witness, Alexander Spitchenko, in violation of the Sixth Amendment and Rules 607 and 608, F.R. Evid.; and 2) that the court's *ex parte* communications with certain jurors without counsel's consent while the jury was deliberating violated defendants' rights to a fair trial. Both grounds are without merit and defendants' motion for a new trial is denied.

## BACKGROUND

On March 27, 2000, a grand jury returned an indictment charging defendants Nosov and Natan Gozman[1] in five counts with (i) the kidnapping of one Sergei Kobozev in aid of racketeering, (ii) murdering Kobozev in aid of racketeering, (iii) conspiring to kidnap Kobozev, (iv) kidnapping Kobozev, and (v) using and carrying a firearm during and in relation to these crimes of violence.

On September 11, 2000, a grand jury returned a superseding indictment virtually identical to the first with the only substantive difference being the addition of Ermichine as a defendant in all counts. On May 2, 2001, the government obtained a second superseding indictment that included the addition of two racketeering charges against defendants Ermichine and Gozman. In particular, defendants Ermi-

chine and Gozman were charged in these new counts with being members of an organized crime group known as the Brigade and with participating in its affairs through a pattern of racketeering, and with conspiring to do so. These new counts list four separate acts of racketeering, including the kidnapping and murder of Kobozev, another kidnapping, an extortion, and a robbery. On October 31, 2001, a third superseding indictment, virtually identical to the second with the exception of minor changes to one of the overt acts alleged for count five and to the "to wit" clauses in counts five and six, was filed.

Following a three-week jury trial, defendants Ermichine and Nosov were both convicted on December 5, 2001 of counts three and four of the indictment, charging them with kidnapping and murdering Kobozev in aid of racketeering and count five, conspiracy to kidnap Kobozev. Defendant Ermichine was also convicted of the two racketeering charges in counts one and two, of which he alone stood charged, involving his membership in and association with the Brigade. Defendants Ermichine and Nosov were acquitted of the charges in count six, the substantive kidnapping charge, and count seven, concerning the use and carrying of a firearm during the kidnapping and murder of Kobozev.

## DISCUSSION

Rule 33 of the Federal Rules of Criminal Procedure provides that a court may in its discretion grant a defendant's motion for a new trial only "if required in the interest of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir.1992). However, motions for a new trial are generally disfavored, *see United States v. Gambino*, 59 F.3d 353, 364 (2d Cir.1995), and granted only in the most extreme of circumstances. *See United States v. Lo-*

---

**1.** Yet to be arrested, defendant Gozman re-     mains at large.

*cascio,* 6 F.3d 924, 949 (2d Cir.1993); *United States v. Ferguson,* 246 F.3d 129, 133–34 (2d Cir.2001). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *Ferguson,* 246 F.3d at 134. At all times, the defendant carries the burden of showing that such an extraordinary remedy is warranted. *United States v. Sasso,* 59 F.3d 341, 350 (2d Cir.1995). In making its determination, the court may weigh the evidence and evaluate the credibility of witnesses but must always be mindful not to wholly usurp the jury's role. *Ferguson,* 246 F.3d at 133 (citing *United States v. Autuori,* 212 F.3d 105, 120 (2d Cir.2000)).

### (1) Cross–Examination of Alexander Spitchenko

Defendants argue that they should have been allowed to impeach Alexander Spitchenko's credibility by inquiring into the fact that Spitchenko, one of the government's cooperating witnesses, while housed at the Metropolitan Correctional Center, had entered into a conspiracy with two other inmates to bring women into the United States from Estonia to appear in pornographic films. (Defs. Mem of Law in Supp. of Rule 33 Motion at 1–2.) This objection is lacking in merit.

This issue first came to the court's attention in a letter to defense counsel of November 6, 2001, in which the government disclosed Spitchenko's proposed business venture. (Gov.'s Mem. of Law in Opp'n to Defs.' Mot., Exh. A.) Shortly thereafter, on November 14, 2001, the government moved *in limine* to prevent defense counsel from questioning Spitchenko about the pornographic nature of the business venture. The government did not object, however, to inquiry by defense counsel into other details of the business venture such as whether Spitchenko might

have discussed paying bribes to officials in Estonia to secure the passage of the women or illegally seizing the passports of the women once they arrived in the United States to ensure that they followed through with their contracts. (Gov.'s Mem. of Law in Opp'n to Defs.' Mot., Exh. B at 2–3.) On November 15, 2001, after reviewing a letter from defendant Ermichine's counsel in opposition to the government's *in limine* motion, the court granted the government's motion to preclude revelation of the pornographic nature of the business venture by defense counsel but allowed cross-examination on all other aspects of it. Counsel were advised that in the court's view any inquiry into the pornographic aspect of the business venture was deemed not probative of Spitchenko's truthfulness, as envisioned by Rule 608(b), F.R. Evid., and would only serve to inflame the jury, being, as it was, predominantly composed of women. (Tr. 142–144.) [2]

▮ As a preliminary matter, "[i]t is settled that '[t]he scope and extent of cross-examination lies within the discretion of the trial judge.'" *United States v. Scarpa,* 913 F.2d 993, 1018 (2d Cir.1990) (quoting *United States v. Blanco,* 861 F.2d 773, 781 (2d Cir.1988)). Moreover, a trial court's decision to curtail or restrict cross-examination will not be reversed on appeal unless there has been a clear abuse of discretion. *See United States v. Maldonado–Rivera,* 922 F.2d 934, 956 (2d Cir.1990). In exercising that discretion on the issue involved here, the court was guided by the strictures of Rules 608(b) and 403, F.R. Evid. in situations involving the revelation of prior acts by a witness. In pertinent part, Rule 608(b) provides that:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility ...

---

**2.** The abbreviation "Tr." refers to the transcript.

may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness ... concerning the witness' character for truthfulness or untruthfulness .... Rule 608(b), F.R. Evid. At the same time, Rule 403, F.R. Evid. provides that evidence, though relevant, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, misleading the jury, or cumulative presentation of evidence. In view of these guiding principles, the court possessed considerable discretion to prevent the defense from introducing the pornographic details of Spitchenko's contemplated scheme.

■ First, the fact that the enterprise concerned a pornographic scheme has relatively little bearing on Spitchenko's capacity for truthfulness and, therefore, fails to satisfy the criteria for delving into specific instances of a witness' conduct under Rule 608(b), F.R. Evid. In general, "[c]ross-examination concerning immoral acts and acts of sexual perversion may be properly excluded by a trial judge who determines they are not probative of the witness's veracity." *United States v. Devery*, 935 F.Supp. 393, 408 (S.D.N.Y.1996) (Preska, J.) (upholding court's refusal to permit cross-examination into cooperating witness' repeated rapes of his juvenile daughter). Similarly, in *United States v. Rabinowitz*, 578 F.2d 910, 912 (2d Cir.1978), the trial court was found to have acted properly in prohibiting cross-examination into the witness' prior acts involving the sodomy of young children. Even murder "is not necessarily indicative of truthfulness." *Eng v. Scully*, 146 F.R.D. 74, 78 (S.D.N.Y.1993) (Lowe, J.). Given that fellow judges in this district have held that crimes such as rape and murder have little bearing on a witness' capacity for truthfulness, a ruling that Spitchenko's scheme to produce pornographic films, itself not a crime, some-

how reflected adversely upon his character for truthfulness would indeed be an anomaly.

■ Second, it is firmly established that restricting the cross-examination of a witness creates no abuse of discretion issue, provided the jury has access to other material that would allow it to form some opinion as to the witness' credibility. "A trial judge does not abuse his discretion by curtailing cross-examination as long as the jury has 'sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely in favor of the government.'" *Scarpa*, 913 F.2d at 1018 (quoting *United States v. Singh*, 628 F.2d 758, 763 (2d Cir.1980)). *See also United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir.1992) (defense counsel prohibited from inquiring into alleged murder committed by government informant on cross-examination, in part, because "there was no dearth of other material on which [the informant] could be cross-examined").

At the time of its *in limine* motion, the government represented to the court that ample evidence would be introduced during trial to allow the jurors to form some opinion as to Spitchenko's truthfulness. (Gov.'s Mem. of Law in Opp'n to Defs.' Mot., Exh. B at 5.) During the course of the trial, the government's representation was borne out by the wealth of evidence it offered concerning Spitchenko's unsavory life of crime.

The government's examination of Spitchenko covers in excess of 160 pages of the record. A very substantial portion of the government's direct examination involved probing every aspect of Spitchenko's criminal past. When the government had concluded its initial examination of Spitchenko, there was an enormous amount of information with which to cross-examine and impeach him without refer-

ence to details touching on the pornographic nature of Spitchenko's scheme. Nor were the defendants barred from eliciting unsavory details of Spitchenko's life, where relevant, beyond his disclosures on direct examination. Most importantly, defendants' cross-examination of Spitchenko, covering roughly 80 pages of the record, shows that defendants had virtually unrestricted access to all areas of Spitchenko's activities appropriate for impeachment purposes.

For example, defendants' cross-examination covered Spitchenko's finances in an attempt to show that he had more money than he was willing to admit and had hidden away some from the government (Tr. 338–39, 397–98), that he had not mentioned Nosov's involvement in the murder and kidnapping or that Kobozev was buried in his backyard at his home in New Jersey during the first of his meetings with the government in which he discussed becoming a cooperating witness (Tr. 342), that in telephone conversations discussing his illegal activities he often used code words (Tr. 347), that he would take people in Russia into a forest and force them to dig their own graves to frighten them as a means of extortion (Tr. 359), that his family, consisting of seven people, had received living expenses from the government as part of being in the witness protection program and that in the year 2001, they had received approximately $147,000 in money and services (Tr. 359), that as a result of his cooperation with the government he expected to remain in the United States with his family after the completion of his prison sentence (Tr. 377), that he had studied law in prison and became aware that, to be guilty of murder in aid of racketeering, the murder has to be in furtherance of a racketeering enterprise, and to be guilty of federal kidnapping, a living person has to be transported across state lines (Tr. 357–58), that he lied and manipulated people to get what he wanted (Tr. 363), that

he repeatedly extorted money from businessmen in Russia (Tr. 364–65.), that he lied on his visa application (Tr. 369), that he had committed murder (Tr. 405), and that he had engaged in literally hundreds of extortions and other crimes. (Tr. 414.)

Moreover, defendants elicited information about Spitchenko's proposed scheme such as the fact that Spitchenko hatched the scheme while in prison, that he expected it to produce $100,000 a month for the partners, that workers for the scheme would be recruited from abroad (from countries once part of the former Soviet Union), that these workers would be paid $1,500 to $2,500 a day, and that they would sign contracts of employment. (Tr. 384–97.) This mass of information establishes that defense counsel suffered from no dearth of specific instances of conduct with which to impeach Spitchenko's credibility under Rule 608(b), F.R. Evid.

Finally, assuming for the moment that the pornographic nature of the films did have some bearing on Spitchenko's truthfulness, the value of such evidence would be outweighed, pursuant to Rule 403, F.R. Evid., by the prejudicial impact that knowledge of the specific nature of these films would have on the jury. It must be recalled that "even if the prior act does concern the witness's character for truthfulness under Rule 608(b), its probative value must not be substantially outweighed by its unfairly prejudicial effect under Rule 403." *Devery,* 935 F.Supp. at 407–08. Disclosure of the pornographic nature of these films would be tremendously inflammatory and prejudicial.

The Second Circuit has repeatedly recognized the inflammatory quality and impact of evidence of a pornographic nature. *See, e.g., United States v. Borello,* 766 F.2d 46 (2d Cir.1985); *United States v. Harvey,* 991 F.2d 981 (2d Cir.1993). *Borello* involved a prosecution for the illegal

smuggling of pornographic videos into the United States. *Harvey* involved the prosecution of an individual for receipt of child pornography. While both cases do not involve Rule 608(b) and the specific context of cross-examination, they are nonetheless instructive because they elucidate the highly prejudicial effect of such evidence. In *Harvey,* the court found reversible error in the introduction of evidence consisting of defendant's possession of adult X-rated videotapes and descriptions thereof. The *Harvey* court noted that, considering that the case involved allegations of child pornography, it could "discern no probativeness [with respect to the adult pornographic evidence] against which to weigh its overwhelmingly prejudicial effect." *Harvey,* 991 F.2d at 996.

In *Borello,* the court noted that the prosecution's introduction of a list of pornographic videos and a pornographic brochure was unduly prejudicial. Despite the fact that the case involved the smuggling of pornographic videos, the court held that "whatever probative value the exhibits had was minimal, in sharp contrast to the obvious prejudicial effect they very probably had on the jurors." *Borello,* 766 F.2d at 60.

Even in cases dealing with or related to pornography and, hence, making the introduction of evidence of pornographic material arguably more relevant, the Second Circuit has been reluctant to permit the introduction of such evidence. Whatever probative value revealing the pornographic nature of Spitchenko's contemplated scheme would have, was clearly outweighed by its potential for inflaming the jury.

In sum, defendants were given wide latitude in their cross-examination of Spitchenko and availed themselves of it. On cross-examination, they were allowed to show that Spitchenko was a professional criminal, a liar, a manipulator, an extor-tionist, had motives to lie and change facts to suit his interests, and was a murderer. Defendants were further allowed to touch upon those aspects of Spitchenko's scheme not relating to its specific pornographic nature. The court's decision to curtail cross-examination, as such, did not deny defendants the opportunity to shed light on Spitchenko's truthfulness. Rather, it prevented the introduction of irrelevant testimony with its potential for creating confusion and causing a waste of time, and was well within the parameters of the discretion the court is permitted to exercise under the relevant circumstances involved.

### (2) Ex Parte Communication With Jurors

On the morning of December 3, 2001, the third day of the jury's deliberations, the deputy court clerk, Bruce Hampton, informed the court that he had been accosted by the foreperson of the jury who told him she had to talk to him. He told her to put her comments in writing. She said she could not do that; she had to speak to him about it and proceeded to tell him she was concerned one of the jurors was violent. She said she was not concerned herself but some of the jurors were worried that he might become violent. Hampton told her that if the juror did become violent, the marshals were there and would handle the situation. He was not certain she said "he" but believed she may have and she also said "hypothetically." (Tr. 947.)

The court asked Hampton to convene counsel for all parties in chambers as soon as they arrived. At approximately 11 A.M., with all counsel present, the court informed them of the exchange between the jury foreperson and the deputy court clerk, and solicited their views on how to proceed. It was agreed that the court should talk to the foreperson outside the presence of counsel and on the record,

after the conclusion of which, the court would reconvene counsel, inform them of the information that it had learned, and determine how next to proceed. (Tr. 947–50.) Counsel also agreed that the court's clerk had no choice but to talk to the jury foreperson. (Tr. 950.)

Hampton recalls the court telling counsel to wait in the courtroom in the interim but the court does not recall giving that specific instruction. As a general matter, however, during jury deliberations, counsel are supposed to wait in the courtroom and, if absent, to advise the deputy clerk where they are. Under no circumstances should they be more than five minutes away. The record does reflect that one of the defense attorneys asked whether counsel should absent themselves from the courtroom, to which the court responded, "I would [sic] I don't think so." (Tr. 950.) In brief, the court fully expected counsel to be in the courtroom but it does not recall giving specific instructions to that effect.

The court met with the jury chair in the robing room with only the court reporter and deputy court clerk present. She informed the court that Friday "people got a little heated during the deliberation [sic], and some of the jurors felt that one of the jurors might get violent." (Tr. 951.) She said that the situation specifically involved the interaction of two other jurors whom she identified as Carol Kessler (Juror # 11) and Michael Anastasio (Juror # 12) with the problem juror whom she identified as Simeon Smith (Juror # 9). Based on discussions between the three, some of the jurors felt that Smith posed a risk of becoming violent "because he stood up and looked very angry." (Tr. 952.) "Mike was agitated, but Simeon was angry." (Tr. 952.) The court was told that, on Friday, Anastasio, Kessler and two other jurors whose last names she could not recall felt intimidated. (Tr. 953.) The court informed the foreperson that it planned to talk to the three jurors; that while the court did not feel that Smith would try to intimidate anybody, Anastasio and Kessler did not appear to feel that way and perhaps the situation could be diffused if the court spoke to the three of them. (Tr. 953.) In answer to her inquiry she was told to tell the other jurors that the reason for her meeting with the court was to clarify an earlier note from them asking for testimony to be reread. (Tr. 954.)

After the foreperson left, the court asked the deputy clerk to bring counsel into the robing room. When the deputy clerk advised the court that counsel were not in the courtroom and he did not know their whereabouts, the court decided to proceed without them, being confident that counsel, when presented with the facts, would ask the court to speak to the three jurors without counsel being present.

The court, aware that Smith was black and that the other two jurors were white, suspected that the problem might have racial overtones. As it turned out it was a race/class-based misunderstanding of the kind one might study in a class in social science. Smith, juror # 9, was a black, blue collar man, a product of black street culture. Kessler, juror # 11, and Anastasio, juror # 12, were middle class whites.

When they arrived in the robing room, the court told Smith that it understood that he had some strong opinions and expressed them loudly and vigorously which he had a right to do and that was all he was doing. He agreed. The court pointed out that in expressing his views loudly and vigorously, however, he might have had an adverse effect on others who might not have understood that he had neither the desire nor the intent to do anything other than express himself in the way that he was used to. Smith agreed and said "I say it the way I see it...I don't believe some of the things they want me to believe, and

I'm not going to say that I do because they want me to." (Tr. 955.)

Kessler said she had been exposed to many different kinds of people and many different ways of expressing things; that "we are 12 people locked up in a room being asked to make a number of decisions, and hopefully we can do that rationally, civilly, without trying to intimidate." Smith then asked, "Who is trying to intimidate?" (Tr. 956.) When the court told him Kessler felt he was, he seemed shocked that she had that reaction because he was expressing his views and did not agree with her. (*Id.*)

Smith complained that he felt intimidated by them: "One is telling me to shut up, it is his turn to speak. Am I in school? I am supposed to have my opinion. I am not supposed to agree with you. . . ." (Tr. 957.)

Anastasio said he would not use the words "shut up." He said that when he was speaking, Smith jumped in not allowing him to finish his thought. "So I just asked him if he could please not talk until I'm finished, and then it was his turn."
\* \* \* \*

"I think that is probably the crux of the problem, just being allowed to say what you need to say. I use a lot of words and I try to think things out while [speaking]. If someone jumps right in, by the time it gets back I won't know what I was trying to say. That is just the way I have learned to try to communicate." (Tr. 957.)

Kessler felt that Smith would glare at her and lean into her during discussions, making her feel physically intimidated. "For me to get up from a table to excuse myself from somebody's presence because they have leaned in to me and glared in to [sic] me, I don't believe that Simeon did it purposely, but that's the way I felt." (Tr. 958.) Smith felt the statement was evidence of prejudice. "I personally have no intention to cause you no [sic] bodily harm,

no [sic] physical harm, no [sic] emotional harm. I am speaking the way I see it. I don't have to agree with you, and you don't like it, you can't change my mind." (Tr. 959.) Kessler said she took "extreme exception to being accused of being prejudiced." No matter who it was, if "they glared at me and leaned in to me, I would feel physically intimidated. So prejudice, no." (*Id.*)

The court told them that they had misunderstood one another. The air was now clear, and they could return to the jury room. (*Id.*) Earlier the court had suggested that it would ask the chair to exercise firmer control, to say who could speak and insist that the speaker be allowed to finish; that, in effect, no one was to speak unless the chair allowed him or her to do so. The court asked if they would agree to abide by the chair's orders. They all agreed they would. (Tr. 958.)

The three left and the chair was brought back to the robing room. The court told her what had transpired and that it thought the problem had been resolved. The court told her that she should not allow anyone to speak unless she recognized him. Thus, every member of the jury could be heard and none would feel intimidated or silenced. The foreperson replied that that was the method she had been trying to follow all along. (Tr. 961.) The court was certain that she had been doing that, and now that the air had been cleared and the rules agreed to by the three jurors with the most difficulty deliberating, it was hoped that the deliberations would be able to proceed more smoothly.

After meeting with the foreperson, Hampton was asked to locate counsel and bring them into the robing room. He found them in the courtroom and brought them to the robing room. The court told them what had transpired during the meetings with the jurors. (Tr. 962–64.) In

informing counsel of what had transpired in the meetings with the jurors, the court acknowledged that it had gone "beyond [its] charge, because you weren't here." (Tr. 961.) Thereafter, the government suggested that, at the next opportunity, the jurors should be reminded that, in communicating with the court about any problems that developed during deliberations, they are not to reveal the substance of their deliberations. (Tr. 964.) Counsel was given assurance that substance had not been discussed, (Tr. 964), just "the process" of their deliberations. (Tr. 965.)

In the interim, the jury had sent a note requesting certain testimony be read. Before doing that, a recess was taken to allow counsel to read the transcript of the meetings between the court and jurors. (Tr. 967.)

When the trial resumed, defense counsel moved for a mistrial on the grounds that the court had improperly infringed on the jury's decision about how to deliberate and that singling out some of the jurors may have had a coercive effect on the jurors involved. The motion was denied. (Tr. 968–70.)

After so ruling, the court called the jury back into the courtroom and provided them with a previously-requested readback of testimony. The jury then resumed their deliberations and proceeded to deliberate for several more hours before being excused at 5 P.M. with instructions to return the next day at 9:30 A.M. to resume their deliberations. (Tr. 973.) The jury continued to deliberate for another day-and-a-half before reporting at 1:10 P.M. on December 5, 2001 that it had reached a verdict.

Defense counsel contend that the court's *ex parte* inquiry with the three jurors was not purely administrative in focus. (Defs.' Mem. of Law in Supp. of Rule 33 Mot. at 6.) Instead, they argue that the defendants were essentially denied a fair trial by the court's meeting with the jurors without counsel's consent. (*Id.* at 7.) The proper course, they assert, would have been, once the court had conducted the initial meeting with the foreperson, to wait to solicit counsel's views on how to proceed before moving forward. (*Id.*).

Defense counsel are correct that the preferred course of action would have been to wait to solicit counsel's views on how to proceed. Rule 43, F.R.Crim. P. grants a defendant the right to be present "at every stage of the trial." The United States Supreme Court, in *Rogers v. United States*, 422 U.S. 35, 39, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975), interpreted this guarantee to mean that inquiries from the jury should be "answered in open court," only after defense counsel has been given an opportunity to be heard. As established as this general proposition may be, the Second Circuit, in this context, has repeatedly recognized that " '[a] violation of the defendant's rights may, under limited circumstances, constitute harmless error and therefore not justify the reversal of a conviction.' " *United States v. Blackmon*, 839 F.2d 900, 915 (2d Cir.1988) (quoting *Krische v. Smith*, 662 F.2d 177, 179 (2d Cir.1981)) (applying "harmless error" analysis to communications between judge and jury outside the presence of counsel); *see also United States v. Rodriguez*, 545 F.2d 829, 831 (2d Cir.1976) (same); *United States v. Glick*, 463 F.2d 491, 493 (2d Cir. 1972); Rule 52(a), F.R.Crim. P.

█  Turning to the facts at hand, the court is convinced that its latter two *ex parte* meetings with the jurors constituted harmless error. Contrary to defense counsel's characterization of the second and third meetings, nothing touching on the substance of the disagreement between the jurors was ever discussed. The focus throughout was on the process of the deliberations, to ensure that they proceeded smoothly, rather than their content.

Defense counsel rely on *United States v. Ronder,* 639 F.2d 931 (2d Cir.1981), in which the Second Circuit reversed a defendant's conviction for corporate income tax violations and ordered a new trial, to argue that the court should not have deviated from the procedures specified therein for communicating with a deliberating jury. (Defs.' Mem. of Law in Supp. of Rule 33 Mot. at 6.) Counsel's reliance on *Ronder* is misplaced, however, as the court's communication with the jury in that case is readily distinguishable from this case. *Ronder* involved a situation where, after receiving a note from the jury that it was deadlocked and failing to disclose the note to counsel, the judge gave the jury a modified Allen charge.[3] That charge was improper in two respects: 1) it may have conveyed to the jury the impression that the government's interest in obtaining a conviction was more important than the defendant's interest in getting an acquittal; and 2) it may have failed to convey to the jury that no juror should surrender a conscientiously-held view simply in order to return a verdict. *Id.* at 932–33.

The court's actions in *Ronder* went beyond the boundary of harmless error because they very likely affected the substance of the jury's deliberations. By contrast, in this case, nothing was done to signal that the jury should decide the case in a certain way or to encourage the jury to abandon a conscientiously-held position for the sake of reaching a verdict. To the contrary, in meeting with the three jurors, the court stressed that jurors had "every right" to have "strong opinions" and to "express[ ] them loudly and vigorously," (Tr. 955), in addition to underscoring their right to disagree with each other. (Tr. 956.)

What the court was concerned with, above all else, was ensuring that no juror felt intimidated by other jurors, much less

physically at-risk, for expressing his/her views. That was the mandate that informed the court's conduct in its first meeting with the foreperson, to which all counsel consented. The same need for clarification and resolution was the purpose of all three meetings. This does not mean that the court could dispense with notification of counsel. However, advised that counsel could not be found, the court reasoned that however dubious the court might view the concern about the potential for violence, prudence dictated diffusion of that potential as quickly as possible to prevent a possible confrontation and disruption in the jury room during deliberations. Moreover, the court was certain counsel would ask it to do what it did because the court was, under the circumstances presented, particularly suited to deal with the problem.

■ Defense counsel argue that defendants were deprived of a fair trial by the court's expanded *ex parte* inquiry, yet they fail to point out how the court's actions caused any prejudice to the defendants. Without specific evidence of how the *ex parte* meetings denied defendants a fair trial, the court must conclude that its actions constituted nothing more than harmless error.

In fact, perhaps the strongest evidence that the *ex parte* meetings did not unfairly prejudice the defendants is that the jury continued to deliberate after the meetings throughout the evening and returned for another day-and-a-half of deliberations before returning a verdict. "The critical distinguishing factor in these cases appears to be the extent of the deliberations after the improper communication." *Krische,* 662 F.2d at 179. Under these circumstances, it is highly unlikely that the court's actions coerced or strong-armed the jury into returning a verdict. The Second Circuit has

---

**3.** *Allen v. United States,* 164 U.S. 492, 501–02, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

repeatedly looked to the extent and nature of deliberations after an *ex parte* communication as a factor in determining whether a motion for a new trial should be granted. *Compare United States v. Taylor*, 562 F.2d 1345, 1366 (2d Cir.1977) (error harmless where deliberations continued for almost two days after trial judge's *ex parte* communication with the jury); *Rodriguez*, 545 F.2d at 831 (where jury deliberated for three hours after trial judge's *ex parte* communication and made an intervening request for the testimony of a crucial witness, error considered harmless), *with Krische*, 662 F.2d at 179 (error not harmless and new trial granted where jury deliberated for an hour and twenty minutes after *ex parte* communication and jury made no further request during that period); *Rogers*, 422 U.S. at 40, 95 S.Ct. 2091 (error not harmless and new trial granted where jury returned verdict only five minutes after trial court's *ex parte* interaction); *Glick*, 463 F.2d at 494–95 (error not harmless and new trial granted when *ex parte* communication informing jury that it could recommend leniency was followed soon after by a verdict). In sum, given the length of the jury's deliberations after the *ex parte* meetings—in this case almost two full days—no basis for court coercion has been made.

Nor is the situation analogous to the one in *Ronder*, on which defendants rely. There, the jury advised the court on two occasions that it was deadlocked, and the judge responded *ex parte* by giving them a modified Allen charge. That same day, the jury broke its impasse and reached a verdict. The Court of Appeals concluded that the fact that the jury was twice deadlocked before the *ex parte* communication, only to miraculously move past the hurdle after being given the Allen charge, constituted strong evidence that the error was not harmless and, based in part on that conclusion, ordered a new trial. *Ronder*, 639 F.2d at 934. Here, the jury was not deadlocked when the *ex parte* communications took place. The court had no idea how the jurors stood on the substance of their deliberations. These topics were never explored. The jury's request for additional readbacks of two witnesses on December 4, 2001, the day after the *ex parte* meetings, suggests that they were performing their fact-finding function as they had done before the meetings with the court and did not feel coerced by the court's interaction with them. *See, e.g., Rodriguez*, 545 F.2d at 831 ("The intervening request for the testimony of a key witness indicated that the jury had received the court's instruction to continue in a responsive manner and was deliberating in a responsible and conscientious fashion."). On these facts, the court is not persuaded that the two *ex parte* meetings affected the substance of the jury's deliberations in any way or otherwise denied the defendants a fair trial.

## CONCLUSION

Defendants have shown no prejudice by the refusal to allow revelation of Spitchenko's plan to produce pornographic films. Nor have they shown prejudice resulting from the ex parte communications with the jurors. On the contrary, harmony was restored in the jury room, allowing deliberations to proceed in an orderly fashion, and although irrelevant to the issues raised, it was evident when the jury came into the courtroom after December 3, that among Kessler, Smith, and Anastasio, hostility and fear had been replaced by warmth.

Defendants Ermichine's and Nosov's motion for a new trial, pursuant to Rule 33, F.R.Crim. P. is denied.

**IT IS SO ORDERED.**